1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF VIRGINIA

3              RICHMOND DIVISION

4

5    ---------------------------------------
                                    :
6    KOLON INDUSTRIES, INC.         :    Civil Action No.
                                    :    3:11CV622
7    vs.                            :
                                    :
8    E.I. DuPONT de NEMOURS AND COMPANY  :    September 30, 2011
                                    :
9    ---------------------------------------

10

11

        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING
12
         BEFORE THE HONORABLE ROBERT E. PAYNE
13
             UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16   Carla Walworth, Esquire
     Mor Wetzler, Esquire
17   Paul Hastings, LLP
     75 East 55th Street
18   New York, New York  10022

19   Christina D. Trimmer, Esquire
     LeClairRyan, PC
20   Riverfront Plaza - East Tower
     951 East Byrd Street
21   Richmond, Virginia  23219
     Counsel for the plaintiff

22

23

24            Peppy Peterson, RPR
               Official Court Reporter
25          United States District Court

1    APPEARANCES:  (cont'g)

2    David D. Cross, Esquire
     Kathleen Clair, Esquire
3    Crowell & Moring, LLP
     1001 Pennsylvania Avenue NW
4    Washington, D.C.  20004

5    Matthew D. Fender, Esquire
     McGuireWoods, LLP
6    One James Center
     901 East Cary Street
7    Richmond, Virginia  23219
     Counsel for the defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1 <u>P R O C E E D I N G S</u>

2

3     THE CLERK:  Civil action number 3:11CV622, and it's

4 the counter claimant Kolon Industries, Incorporated versus

5 counter defendant, E.I. DuPont de Nemours and Company.

6 Representing Kolon Industries is -- will counsel please state

7 their names for the record and identify the parties they

8 represent.

9     MS. WALWORTH:  Carla Walworth for Kolon Industries,

10 and I have with me my colleague Mor Wetzler, and Christy

11 Trimmer from LeClairRyan.

12     MR. CROSS:  Good afternoon, Your Honor.  David Cross

13 of Crowell & Moring on behalf of DuPont.  With me is Kitty

14 Clair from Crowell & Moring and also Matthew Fender from

15 McGuireWoods.

16     THE COURT:  All right.  There are a number of

17 questions that need to get resolved here.  First I need to know

18 the status of the production of documents from Kolon's

19 third-party marketing sales agents, Mr. Cross, that are dealt

20 with in paragraph seven of the order entered herein on

21 September 16th.

22     MR. CROSS:  Your Honor, my understanding is that that

23 is still incomplete.

24     THE COURT:  Has anything else been produced?  That's

25 the question.

1    MR. CROSS:  We received one production from a third

2 party directly.  So that, I think, covers now two of the

3 agents.  My understanding is we have not received anything

4 else, but I will confess, I was here in the courthouse and in

5 deposition the last two days, but I haven't received notice of

6 any other production from any third-party agents.

7           THE COURT:  Is that a correct status, Ms. Walworth?

8           MS. WALWORTH:  I'm sorry, Your Honor.  I couldn't --

9           THE COURT:  Is that a correct status?

10           MS. WALWORTH:  Yes, Your Honor.  Subpoenas are

11 returnable today, the response to the Rule 45 subpoenas.

12           THE COURT:  That's not what I'm asking.  I'm talking

13 about what you are supposed to do, not what they did.

14           MS. WALWORTH:  I can report on an updated basis what

15 we're doing --

16           THE COURT:  Well, have you produced anything?  That's

17 all I want to know.  Have you produced anything other than what

18 they obtained from one person in response to the subpoena?

19 Have you done what you are supposed to do under paragraph

20 seven?  That's all I'm interested in.

21           MS. WALWORTH:  Yes, Your Honor.  We produced over

22 half a gigabyte of data from Akro Polychem, Inc.

23           THE COURT:  Wait just a minute.  From who?

24           MS. WALWORTH:  Akro Polychem, Inc.

25           THE COURT:  What is that?  That's not in paragraph

1    seven.

2          MS. WALWORTH:  I'm sorry, Your Honor.  I don't know

3    what you are referring to when you say in paragraph seven.

4          THE COURT:  The order of the 16th.  Michael Mitchell,

5    H. K. Jung, J-u-n-g, Joe Kaminsky, Bruce Lindley, David

6    Scarponi, Dave Murphy, Brian Seekamp, and Steve Chung.

7          MS. WALWORTH:  Those are individuals, Your Honor, and

8    Akro Polychem, its -- its president and officers are David

9    Scarponi and David Murphy.

10          THE COURT:  So have you complied with the order as to

11    those people?

12          MS. WALWORTH:  I complied by providing half a

13    gigabyte of data, Your Honor, yes.

14          THE COURT:  Any of the others, Michael Mitchell, H.

15    K. Jung, Joe Kaminsky, Bruce Lindley, Brian Seekamp, Steven

16    Chung?

17          MS. WALWORTH:  Yes, Your Honor.  With respect to Mr.

18    Jung at Gane Company --

19          THE COURT:  That's not any of the names I gave you.

20          MS. WALWORTH:  Jung, J-u-n-g.

21          THE COURT:  And that's -- his name is Jung and

22    Company?

23          MS. WALWORTH:  No.  It's Gane Incorporated, Your

24    Honor.  The individual contact name is H. K. Jung.

25          THE COURT:  Have you complied by providing that

information?

MS. WALWORTH:  I have complied by attempting to seek that information, Your Honor --

THE COURT:  No, I didn't ask you that.  Have you complied by providing that information?

MS. WALWORTH:  I was not able -- I was refused it, Your Honor.

THE COURT:  So is there anybody else that you have complied with by providing the information?

MS. WALWORTH:  Yes, Your Honor.

THE COURT:  Who?  Give me the name.

MS. WALWORTH:  Yes, I will, Your Honor.

THE COURT:  Let's go.  I've got things to do this afternoon, too.  You all need to get back to depositions.  There are several other things that need to get going.

MS. WALWORTH:  Mr. Kaminsky, through his counsel, said he would respond -- he's out of the country until mid October.  He said he would provide documents upon his return, so I have complied, Your Honor, by attempting to collect documents and obtaining a promise of compliance from Mr. Kaminsky.

I've also gotten a report from -- if I may, Your Honor, for just a moment.  I need to confirm.  I've gotten a report from Barnett.  I'm trying to get the first name.  I've gotten a report from Barnett, Your Honor, which is not on this

1    list, but it's one that received a third-party subpoena from --

2    request from us which is that they have no documents to

3    produce.

4              THE COURT:  I'm interested in the ones I ordered you

5    to produce.

6              MS. WALWORTH:  Yes, Your Honor.  It is among those

7    that you ordered us to produce.

8              THE COURT:  Where is it?

9              MS. WALWORTH:  What do you mean, where is it?

10             THE COURT:  Which person?

11             MS. WALWORTH:  I'm getting the name.  Through his

12   attorney, Joel Mark.  The name of the company is Mike Taylor at

13   Barnett Tool and Manufacturing.

14             THE COURT:  His name is not on that list.

15             MS. WALWORTH:  All right.  Thank you, Your Honor.

16   And with respect to the others, I've made more than 20 phone

17   calls attempting to obtain compliance.

18             THE COURT:  So the answer is you have not obtained

19   compliance as to Michael Mitchell, as to Mr. Jung, as to Mr.

20   Kaminsky, as to Mr. Lindley, as to Mr. Seekamp, and S. K.

21   Chung; is that correct?

22             MR. CROSS:  That sounds correct to me, Your Honor,

23   based on the representation.

24             MS. WALWORTH:  Excuse me, Your Honor.  I've received

25   information back from Brian Seekamp that he had only a few

1  emails, but it was on a hard drive that crashed, and he would

2  not incur the cost to restore it, but he stated that he would

3  likely not have anything more than an email or two.

4          THE COURT:  All right.  Okay.  Now, you raised this

5  as an issue, Mr. Cross, in your letter, but you didn't tell me

6  what you wanted to do.  What is it you want me to do as to

7  these?

8          MR. CROSS:  As to these, yes, Your Honor.  We are --

9  to be totally candid with the Court, we're struggling with what

10  the appropriate remedy is, because ordinarily we would simply

11  seek preclusion of any evidence, but here, the evidence is

12  actually helpful for us as we've seen in the documents.

13          We think what ultimately may be appropriate is an

14  adverse inference.  They were ordered to collect documents from

15  their own agents.  We just had a two-day deposition with Mr.

16  Seo who was the head of the business.  He testified that they

17  had regular communications with their agents.  Their agents

18  were required to prepare regular reports on their activities,

19  selling Heracron® in the U.S.  We have some examples of those.

20  It looks to be only from Michael Mitchell -- I take that back.

21          There is one other one that I can recall, I think

22  from Mr. Jung.  Now we're hearing that these people who were

23  principally responsible for selling Heracron® in the U.S. --

24  Mr. Kang has testified just today that these were the

25  individuals that Kolon relied on to sell its product.  These

1   individuals knew more about the market than Kolon employees,

2   and they relied on them to do it.

3           I do not understand how they will ever prove up a

4   claim that they actually attempted to sell this in the U.S.

5   without documents from these agents.

6           Ultimately --

7           THE COURT:  What do you want me to do?

8           MR. CROSS:  Well, Your Honor, at this point, we think

9   the bear minimum should be an adverse inference against Kolon,

10  that these documents would have been unfavorable to them.  They

11  agreed on August 16th to collect them.  They said they would

12  produce them by the 27th of August.  They've been ordered to

13  produce them, and they haven't.  At the bare minimum, Your

14  Honor, we would seek an adverse inference.  We think we're

15  getting close given other problems in this case --

16          THE COURT:  I thought it was the 20th of September.

17          MR. CROSS:  I'm sorry.

18          THE COURT:  The 20th of September they said they were

19  going to produce them.

20          MR. CROSS:  They originally said they were going to

21  produce --

22          THE COURT:  You mean the order says September 20th.

23          MR. CROSS:  That's right, Your Honor, the order says

24  September 20th.  That's right.

25          THE COURT:  Well, thank you.

1          MR. CROSS:  Thank you.

2          THE COURT:  As I understand it, Mr. Jung -- first, as

3    I understand the record in this case, this information was

4    requested, and Kolon agreed to produce it and acknowledge that

5    it had the obligation to provide the information from these

6    agents.

7          I then -- it hadn't been produced, and I ordered, on

8    September 16th, that the production from these people, Michael

9    Mitchell, H. K. Jung, Joe Kaminsky, Bruce Lindley, David

10   Scarponi, David Murphy, Brian Seekamp, S. K. Chung occur not

11   later than September 20th.

12         It wasn't done.  As I understand it, there's still

13   nothing from Mitchell.  There's nothing from Jung.  Jung has

14   refused to produce it.  There's nothing from Kaminsky.

15   Kaminsky says he will be back in the country and will try to do

16   something by the 15th of October.  There's nothing from

17   Lindley.  Scarponi and Murphy, there has been purveying of

18   information.

19         Mr. Seekamp says somehow his was lost.  We don't know

20   much more than that.  Mr. Chung says that -- there's nothing

21   from Mr. Chung, and there was a court order that was a

22   requirement to produce this information after counsel were

23   heard on it, after counsel from Kolon acknowledged they had an

24   obligation to produce it, and they didn't do it.

25         They are then in violation of the order, apparently

1    in its entirety, because there hasn't been any representation

2    that Scarponi or Murphy got it.  They got it as to Scarponi or

3    Murphy by September 20th, but it does appear as if it has been

4    obtained as to Scarponi and Murphy, and so -- and apparently

5    Mr. Seekamp says he lost his information.

6            As to the others, do you have any from Mr. Mitchell?

7    Did Mr. Mitchell produce anything?  Somebody said something

8    about Mitchell earlier today.  Did you get anything from Mr.

9    Mitchell from them, from Ms. Walworth?

10           MR. CROSS:  No, Your Honor.

11           THE COURT:  Then you are in default as to Mr.

12   Mitchell, as to Jung, as to Kaminsky, as to Lindley, as to

13   Chung, and that's what's happened, and that's where you are.

14   You violated the court order.  You will have sanctions imposed.

15           I am unsure whether the sanction will be that you

16   can't introduce any evidence about any sales that might have

17   been made through those people or there will be an adverse

18   inference, but there will be sanctions imposed because of that.

19   That will be the order.

20           DuPont will file its brief respecting what sanctions

21   are appropriate by -- can I have my book -- by October 15th.

22   Kolon will file its response by October 22nd.  DuPont will file

23   its reply by October 29th on what are the appropriate

24   sanctions.  If I need a hearing, I'll notify you that I need a

25   hearing.  That takes care of that issue.

1          MS. WALWORTH:  Your Honor, I have never been heard on

2  this issue which is quite a problem and violates due process

3  rights for my client, and I would like to note that for the

4  record, sir.  I understand your ruling is final.

5          THE COURT:  Ms. Walworth.

6          MS. WALWORTH:  Yes, sir.

7          THE COURT:  You were just asked to explain to me what

8  it is that you -- how you complied, and you have submitted

9  papers which I have read.  You have been heard.  Don't --

10  please, if you believe that's the situation, fine.  Don't,

11  please, ever again act petulantly here.

12          MS. WALWORTH:  Your Honor --

13          THE COURT:  Have a seat.  That's enough.

14          MS. WALWORTH:  You will not allow me to speak, Your

15  Honor, during this argument at all.  I will sit down.

16          THE COURT:  No, I didn't say that.  What I said is

17  you need to get your act together and act like a lawyer.  Now

18  stop it.

19          MS. WALWORTH:  You have told me twice, Your Honor, to

20  be quiet.  I've not been heard.  I would like to note for the

21  record that I tried to speak and have not been heard.  Thank

22  you, Your Honor.

23          THE COURT:  Ms. Walworth.

24          MS. WALWORTH:  Yes, sir.

25          THE COURT:  Your privilege to practice in this court

1    is on the verge of being revoked.  You have been heard, you

2    were allowed to submit papers.  I have reviewed the papers, and

3    I asked you what was the status of your compliance.  You

4    reported it.

5            You've been heard, and it is disingenuous of you and

6    borders on misrepresenting the record for you to say -- maybe

7    it is a misrepresentation for you to say that.  Now, you're

8    going to learn what your place is and what my job is, and if

9    you've got something to say and do, there's a way for you to do

10   it, but I'm about through with you and having to tolerate the

11   way you act.  There may be somebody else who will have an

12   opportunity to participate in this case.  Now you stop it.  You

13   may be seated.

14           MS. WALWORTH:  Thank you, Your Honor.

15           THE COURT:  There have been briefs filed on DuPont's

16   motion for protective order for responses, and a response has

17   been filed, an opposition has been filed, and a reply has been

18   filed.

19           As to the issue about DuPont's lobbying activities,

20   its litigation in the 1986, et cetera, Akzo cases and the

21   matter before the ITC, first I'd like to know -- I don't really

22   understand, Mr. Cross, what it is you want me to do other than

23   to deal with the matter of Rule 30(b)(6) notices.

24           I don't know what authority I have to act with

25   respect to the subpoenas they issued to all of these other

1    people.  They are not issued out of this court, are they?

2            MR. CROSS:  I believe that there are two or three

3    that are out of the Eastern District of Virginia but not this

4    division.

5            THE COURT:  That doesn't make any difference.  If

6    they're out of this court, that's all right.

7            MR. CROSS:  My understanding is I believe there are

8    two or three that are out of the Eastern District of Virginia.

9    I'll get those for you in just a moment, Your Honor.

10           As to your broader question, if you want me to

11   address that, while Your Honor does not have the jurisdiction

12   to quash the subpoenas issued by other courts -- we don't

13   dispute that -- you have jurisdiction over Kolon, and we

14   believe that this Court can enter a protective order ordering

15   them to withdraw the subpoenas.

16           So, again, to be clear, we're not saying that this

17   Court can reach out and quash the subpoena issued by a court in

18   Minnesota, but because you have jurisdiction over Kolon, you

19   should be able to enter an order that directs them to withdraw

20   subpoenas to enforce your limits on the scope of discovery in

21   this case.

22           THE COURT:  Now, if a deposition notice had been

23   issued for those subpoenas, this Court would have authority to

24   issue protective orders about depositions, wouldn't it?

25           MR. CROSS:  I believe Your Honor has authority to

1    issue a protective order as to documents or depositions,

2    because, again, Your Honor has jurisdiction and authority over

3    Kolon.  It can order Kolon to take certain actions or not and

4    limit the scope of discovery for this case.

5            THE COURT:  How about the subpoenas in the other

6    jurisdictions, the third-party subpoenas, are they in the same

7    category, or documents but not depositions?

8            MR. CROSS:  Yes, Your Honor, I believe so.  Let me

9    just give Your Honor, quickly, the three that are out of the

10   Eastern District of Virginia.  One is to American Business

11   Development Group which is located in Arlington.  Another is

12   Patrick Tucker, and a third is the Rooney Group.  So those

13   three, I would submit, Your Honor, although they are not out of

14   this division, I would think they are certainly within the

15   Court's power to quash.

16           As to subpoenas issued from the other court, our

17   position is that because Your Honor has power over Kolon, and

18   Kolon is the party that submitted those subpoenas out of the

19   other courts, Your Honor can order Kolon to withdraw them.

20           It is entirely within Kolon's power to withdraw any

21   subpoena it submits.  We've served subpoenas.  We could reach

22   out and withdraw those at any time.  Your Honor could enter an

23   order that directs Kolon to withdraw the subpoenas.

24           The alternative is, Your Honor, that we and/or these

25   third parties would have to file motions to quash in a large

1    number of courts all across this country.

2            THE COURT:  What's wrong with that?  You're a big law

3    firm.  Isn't that the way it's normally done?

4            MR. CROSS:  I would confess, I've never had a case

5    with this many subpoenas out of so many courts, but that aside,

6    that's extremely costly and burdensome, and it imposes costs

7    and burdens on the third parties themselves, and the courts

8    have long held the courts should avoid imposing costs and

9    burdens on third parties if at all possible, and we believe

10   that we've presented the Court with an avenue that does it

11   efficiently and cost effectively, and it also avoids

12   burdening -- I confess, I don't remember the exact number of

13   courts.  I could probably get that quickly, but I think well in

14   excess of a dozen, because by our count, there's 25

15   customers --

16           THE COURT:  I think you need to start paying

17   attention to the rules of procedure, and you need to explain to

18   the Court when I have an authority to do something that is as

19   unusual as you are asking, and this needs to be dealt with in

20   an efficient way, not in the way that it's been dealt with so

21   far.

22           Now, I am -- I have to ask you, on the topic of the

23   legislative activities, on the topic of the -- that would

24   include the lobbying and the Berry Amendment and the ITC

25   proceedings and the Akzo litigation, it looks as if to me that

1    the Fourth Circuit -- would you get that case off my desk.  I

2    thought I had brought it out here, but I didn't.  That the

3    Fourth Circuit has concluded that -- how they manage to

4    conclude it, I do not know, but they did, that that kind of

5    information is adequately or sufficiently providing supporting

6    information for one element of the attempt to monopolize a

7    claim.

8            They held that, and it seems to me as if, to a

9    certain extent, that has to guide the approach that this Court

10   takes to the matter.

11           MR. CROSS:  Your Honor, a few responses on that.

12   First, we would respectfully disagree that -- we don't read

13   that portion of the Fourth Circuit's decision as a holding.

14   What the Fourth Circuit says, as to the second element,

15   specific intent to monopolize, this Court has previously stated

16   that specific intent may be inferred from the defendant's

17   anticompetitive practices.  We have already held that Kolon

18   adequately pled anticompetitive practices.

19           The holding the Fourth Circuit reached was because it

20   had already held on the monopolization claim that -- and in the

21   context of looking at the geographic market, because it had

22   already held that Kolon had adequately pled anticompetitive

23   practices, then there was enough there for specific intent, and

24   the proceedings --

25           THE COURT:  Read the rest of it.

1      MR. CROSS:  I am.  I'm getting to that.  I want to

2   put it in context, if I may.  The entire decision, the entire

3   opinion, before you get to the next sentence, talks only about

4   supply agreements.  What we read the Court as saying --

5      THE COURT:  I know that.  I've read the opinion.

6      MR. CROSS:  That, Your Honor, is what we submit is

7   the holding.  The Court then goes on to say, further --

8      THE COURT:  Would you tell her that that case is out

9   here.  I have it here after all.  I did pick it up and bring it

10  here.

11     MR. CROSS:  I'm at page 28, Your Honor.  It's the

12  second to last page.  The Court does go on to say, further,

13  Kolon alleged various actions undertaken by DuPont over time to

14  protect its dominant market position.  It gets into a list,

15  successfully seeking and obtaining a ban against imports of

16  certain para-aramid fibers into the United States in 1986,

17  scaring off others in the industry through trade disputes, and

18  fighting the U.S. International Trade Commission's revocation

19  of antidumping duties on para-aramid fibers.  Kolon has,

20  therefore, sufficiently pled specific intent to monopolize.

21     Your Honor, this portion we did not read as a part of

22  their holding.  If Your Honor reads it that way, we certainly

23  will respect that, but what we read is the holding is based on

24  everything that comes in the prior 27 pages of the opinion

25  which talk only about the supply agreements.

1          But the last point on this, Your Honor, is, there's

2     no mention of the patent litigations here.

3          THE COURT:  No.

4          MR. CROSS:  Even if the Fourth Circuit is read as to

5     having some sort of controlling authority, they only mention

6     the ITC proceeding.  So the patent litigations are not

7     mentioned here at all.

8          THE COURT:  But isn't the patent mentioned in the --

9     litigation mentioned in the complaint?

10         MR. CROSS:  It is, but if we're going to read the

11    Fourth Circuit as having identified specific allegations from

12    the counterclaim as supporting a specific intent, and if that's

13    how we're reading the Fourth Circuit's opinion, they identified

14    the ones they thought were sufficient.

15         Again, we don't think that's a holding, but reading

16    it that way, they picked what they thought was sufficient, and

17    they did not include the patent litigations which go back to

18    the 1980s.  So at the most anyone could give a reading to this

19    is it would be the ITC proceedings.  That would be the most,

20    Your Honor.

21         Two other points -- I'm sorry, the last point on

22    this, Your Honor, there have been developments in this case

23    that have limited discovery since this opinion issued, and

24    while certainly, as Your Honor has pointed out before, we all

25    have to operate within the framework the Fourth Circuit has

1  set, it has been established that by agreement, by agreement of

2  opposing counsel, there is a specific time frame for discovery

3  in this case.  That is not in dispute, it's been resolved, it's

4  been ordered, and this goes back 20 years before that, Your

5  Honor.

6  THE COURT:  I don't know that it actually limited the

7  scope of discovery.  It limited the scope of the claim.  You

8  have to read carefully what you're talking about.  It looks to

9  me like that in the -- that what needs to be addressed is the

10  extent to which any of that evidence that they -- in view of

11  the Fourth Circuit's opinion, any of the evidence that they

12  seek, how it relates to the elements of the offense that they

13  are claiming, and Sand and Siffert, for example, in instruction

14  80-3, section 80.01, lists some of the elements, and that is

15  that the defendant had monopoly power during the period alleged

16  in the indictment, that the defendant acquired -- third

17  element -- and/or maintained monopoly power knowingly, and that

18  it acquired monopoly power through anticompetitive conduct.

19  That's as to the monopolization offense claim.

20  As to the attempted monopolization claim, is that the

21  defendant had a specific intent to achieve a monopoly.  What

22  the Fourth Circuit doesn't really deal with, in my judgment, is

23  the temporal connection between the allegations, the operative

24  allegations of exclusionary conduct and the elements of the

25  offense.  It's a somewhat disconnected approach.

1          MR. CROSS:  I think there's also another missing

2    link, Your Honor, which is the Fourth Circuit doesn't take into

3    account the protections on the conduct at issue.  The

4    Noerr-Pennington doctrine has long recognized that petitioning

5    the government, including in the courts -- the U.S. Supreme

6    Court, in *Cal Motor Transport Company v. Trucking Unlimited,*

7    held that Noerr-Pennington also extends to the Court.

8          THE COURT:  Yes, it does, but you also didn't -- you

9    all just didn't even touch the *Electric Company* case in your

10   briefs, *North Carolina Electric*, didn't even touch that, so

11   here's what I think.

12          I don't know -- you can have a seat.

13          MR. CROSS:  Thank you, Your Honor.

14          THE COURT:  I will now hear from Ms. Walworth on

15   this, but I don't need to hear a lot because I think there

16   needs to be further addressing of all this before I can make

17   any ruling, but you can respond to what he said.

18          MS. WALWORTH:  The only thing I would like to respond

19   to, Your Honor, in light of your comments, is to say that

20   there's no agreement with respect to the correct duration,

21   period of discovery, but I don't think -- that's simply to

22   correct my position.  I don't think you have to address that in

23   order to make these decisions, Your Honor.  Thank you.

24          THE COURT:  Well, I have serious doubts whether any

25   of the lobbying activity is discoverable.  Lobbying is

petitioning the government.  Petitioning the government is

protected.  Noerr-Pennington, I believe, provides an antitrust

exemption from petitioning activity, but you all haven't really

addressed the significant components, the real way that

Noerr-Pennington operates, and nor has either side -- nor has

DuPont addressed the *North Carolina Electric Membership*

*Corporation*, the *Carolina Power*, and there are statements that

Noerr-Pennington doesn't operate in the discovery realm.

Well -- and there can be instances in which that is

correct, but the real issue is that a discovery has to be aimed

at a claim.  When you are doing discovery, any of your

discovery has to be pertinent to some element of some

cognizable claim, and until you tie this discovery to a claim,

I'm not going to allow any of it to occur.

There's too much -- I have read the discovery in this

case, and Kolon's papers attempt to make these broad, sweeping

requests for information.  They want a 30(b)(6) on the, quote,

Akzo litigation, for example.  They want a 30(b)(6) witness on

the ITC litigation, for example.  They want a 30(b)(6)

deposition on the lobbying activities of DuPont, for example.

Those are extremely broad designations, and they are

not going to be allowed, because they are so broad.  There may

be areas within each of these topics as to which discovery

might be permissible, but they're going to have to be

circumscribed, and the way you're going to circumscribe them is

1  to tie all this to -- your request for information to a claim

2  in the case and then an element in the claim.

3          If you can't do that, then you don't get it, but you

4  didn't do it in your brief, Ms. Walworth, you haven't done it

5  in your brief in defense, and it's inadequately presented, and,

6  quite frankly, it affects a lot of people.  It affects not only

7  you but a lot of other people.

8          So insofar as I'm concerned, I'm staying all

9  discovery on those three areas until I receive from the

10  plaintiffs and the defendants a briefing on the full scope of

11  the matters so that I can address them intelligently and

12  carefully.

13          My immediate reaction is that the Fourth Circuit's

14  comments on page 400, and I think it's 53 of the Federal

15  Reporter that the case is reported in, do not serve in any way

16  to rule on discovery.  It is in a section that deals only with

17  one component of one claim, and that is the attempt to

18  monopolize.

19          Now, Kolon takes the view implicitly in its arguments

20  that by intent to monopolize, that attempt to monopolize is

21  sufficient if you show it back when you did the lobbying,

22  whenever in time, 20, 30, 40 years ago.  I don't think that's

23  the law, but until such time as I receive proper papers on

24  this, I'm staying all discovery on these activities by Kolon.

25          Once I've decided the scope of what actually can be

1   done, then, perhaps, that would help other courts, if

2   necessary, to deal with it, and I need to know the extent to

3   which I actually have authority to rule on and protect the

4   people you are talking about.

5         Now, this is a fairly significant undertaking and

6   you're going to have to do it right.  Kolon takes the view in

7   its papers that these topics are important to its case.  It may

8   be.  DuPont talks about how irrelevant they are.  They may be.

9   None of the papers before me help me out on that, so I'm going

10   to allow Kolon to file a motion to compel and a brief on each

11   area of the 30(b)(6) depositions that it noticed.

12         That's what's before me right now.  That's the only

13   thing that's before me right now.  There's no document request

14   that's before me on this, is there?

15         MR. CROSS:  Not to DuPont, but there are the

16   subpoenas.

17         THE COURT:  I understand that.

18         MR. CROSS:  Okay.

19         THE COURT:  As to what's before me are the 30(b)(6)

20   requests.  I need to know exactly what kind of 30(b)(6) topics

21   you are talking about, and I will tell you, it will not inure

22   to your benefit, Ms. Walworth, to make a laundry list that is a

23   great long laundry list.  Focused examination -- if I see that,

24   then I will conclude that this is what it appears to be, a

25   fishing expedition.

1        There may very well be parts and aspects of the

2   litigation or ITC proceedings and the lobbying that have

3   pertinence, but you're going to have to link specific topics to

4   specific elements of the offense and show me with case law that

5   this information would apply, and you have to face the temporal

6   limit.

7        Discovery is pertinent only to the extent relevant or

8   reasonably calculated to lead to discovery of admissible

9   evidence.  Now, I view this as an undertaking that I think will

10  take some time to do right.  When do you propose to do the

11  briefing, Ms. Walworth?  I don't know what else you all are

12  working on.

13       MS. WALWORTH:  Your Honor, I'd like ten days within

14  which to do the briefing if I may, inclusive.

15       THE COURT:  What does that mean?

16       MS. WALWORTH:  It means count your weekends, please,

17  Your Honor.

18       THE COURT:  You are saying by October 17th; will that

19  be sufficient?

20       MS. WALWORTH:  Yes, Your Honor.  Thank you.

21       THE COURT:  You file your motion to compel these

22  30(b)(6) topics, refine the topics, tie them to elements.  You

23  have two claims, and the Fourth Circuit has already defined it,

24  and you have defined what you say are the exclusionary conduct

25  issues.  So you have to tie it to something other than

1  exclusionary conduct, it looks like, but I'll let you do that.

2         You can be doing research, too, already, and when

3  will you file your response to that?  October 31st?

4         MR. CROSS:  That would be fine, Your Honor.

5         THE COURT:  And your reply, November 7th, Ms.

6  Walworth.

7         MS. WALWORTH:  Yes, Your Honor.  Thank you.

8         THE COURT:  And until that time, all discovery on

9  that topic is stayed by -- Kolon is prohibited from engaging in

10 it until we get it defined.  I am not saying that it shouldn't

11 be allowed.  I am saying that the way it's structured, it

12 cannot be allowed as it stands.  If that's all I end up with,

13 that will be the answer.

14        I'll go ahead and explain what I think, and that is

15 this broad, sweeping approach untethered to any topic and with

16 nobody linking it to time simply -- it isn't within the reach

17 of the complaint, and the Fourth Circuit did not address that

18 issue, those issues.  That takes care of that issue in the

19 protective order.

20        I don't have the power to stay proceedings in other

21 courts, but I do have the power to stay Kolon's activities to

22 enforce the subpoenas, to pursue enforcement of the subpoenas,

23 and that stay will include that; do you understand that, Ms.

24 Walworth?

25        MS. WALWORTH:  I do understand it, Your Honor,

1    although it was not necessary, sir.

2           THE COURT:  Well, I'm actually doing something for

3    the benefit of other courts so they understand what we are

4    doing.

5           MS. WALWORTH:  I understand.

6           THE COURT:  We all are operating on the same

7    framework, because there's no sense in having other courts

8    having to weigh in on the issue until the framework is set, and

9    then if other courts need to weigh in on it, they'll be free to

10   weigh in on it.  I'm not trying to take jurisdiction away from

11   another court.

12          If you believe I have authority to protect the other

13   people, then you show me I've got the authority, and you give

14   me a response.  All right?

15          MS. WALWORTH:  Yes.

16          THE COURT:  If you take the view that I don't have

17   authority under the protective order powers or under Rule 45 or

18   under Rule 26 of any kind to do it, you take that view and you

19   explain your view in your papers to begin with.

20          All right, now, I've ruled on the motion on the --

21   what do you call it, transactional data.  I've ruled on that

22   request.  Is there anything else that we need to deal with at

23   this time in the way of discovery?

24          MS. WALWORTH:  Your Honor, if I may, I would --

25          THE COURT:  I mean of the things that are pending.

1    I'm not inviting new topics.  I'm talking about things that are

2    pending in DuPont's motion for protective order, and as far as

3    I can tell, the only issue that really was live out of this

4    whole -- Mr. Cross's September 22 letter package and all that

5    ensued that, which was really your request for referral to a

6    special master, and their reply was the September 16 order and

7    compliance with it, and I've already dealt with that.

8              MR. CROSS:  There is one --

9              THE COURT:  Wait a minute.  She has an opportunity to

10   go first, and I was just explaining to her what I saw.  Yes,

11   Ms. Walworth.

12             MS. WALWORTH:  Thank you, Your Honor.  I think with

13   respect to the motion for a referral to a special master, I

14   would renew the request that Your Honor appoint someone for

15   issues that might arise during the depositions.  I hope none do

16   and none have, but it will enable --

17             THE COURT:  During what depositions, Ms. Walworth?

18             MS. WALWORTH:  There are depositions coming up during

19   the month of October, Your Honor, including depositions of all

20   of the Kolon witnesses and four or five executives at a

21   minimum --

22             THE COURT:  Where are they going to be held, Ms.

23   Walworth?

24             MS. WALWORTH:  Some of them will be held here in

25   Richmond.  I believe there's an offer of one being held in

1    D.C., and DuPont, some of the DuPont witnesses will be in

2    Delaware, Your Honor.  And our hope is -- you know, we haven't

3    had to call upon the Court, I don't believe, either party,

4    during the depositions at all, and I hope that that continues,

5    but simply to assure that we make progress, Your Honor, may I

6    ask for that referral in your absence?

7              MR. CROSS:  May I?

8              THE COURT:  Yes.

9              MR. CROSS:  Your Honor, in our papers, we did take

10   the position that we didn't oppose a special master.  The one

11   caveat I would add is we think it makes more practical sense to

12   have a magistrate if Your Honor is inclined to do that, and if

13   there's a magistrate at the Court who is inclined to do that,

14   because I think in my experience it's more efficient and more

15   effective to have a magistrate deal with it.

16             My hope is there are no disputes, but I think we

17   would prefer a magistrate, but if Your Honor prefers a special

18   master, we will accept that.

19             MS. WALWORTH:  Your Honor, no objection.

20             THE COURT:  You are only talking about while I'm

21   gone, and I'm not going to appoint a special master for that

22   purpose.  I will -- one of the magistrate judges will be

23   available to help you out.

24             MR. CROSS:  Thank you.

25             THE COURT:  I need to check and see which one I

1    really want to punish.  They are good friends, and I don't want
2    to lose them.
3            MR. CROSS:  Your Honor, we will do our best to
4    accommodate that, Your Honor.
5            THE COURT:  All right.  Now, is there anything else
6    that needs to be dealt with in the protective order or what I
7    call the Cross letter package which is all that started with
8    the September 22 letter that you wrote and is really addressed
9    by Ms. Walworth in her special master papers and then your
10   reply, and that's where really a lot of those issues got
11   framed, but I think they've all been sorted out now.  Maybe I'm
12   wrong.  What do you say?
13           MR. CROSS:  There is one remaining issue, Your Honor,
14   which concerns a number of the customer subpoenas and
15   deposition notices.
16           THE COURT:  Oh, yes.  Look, here's the bottom line on
17   that.  Rule 45 was changed.  It used to be the rule that you
18   couldn't have a deposition -- you couldn't have a subpoena
19   under Rule 45 unless you also had a deposition along with it.
20           I believe that the rule was changed to allow
21   depositions -- I mean to allow the subpoena without the
22   depositions.  However, anybody who does that runs a terrible
23   risk that you're not going to be able to get the documents into
24   evidence, and I don't think -- I don't know -- I suppose it's
25   possible to hold that all of the documents from the third

1  parties would be produceable, would be controlled -- would be

2  controlled by the rule that says that if you can't get a

3  document into evidence, that if you can't get a document into

4  evidence, then it's not relevant or reasonably calculated to

5  lead to the discovery of admissible evidence which seems to be

6  the thrust of your reply brief, Mr. Cross, but there could be,

7  within the reservoir of third-party documents, documents that

8  are -- do not depend on the deposition of that person to get

9  in.

10  There may be documents that, for example, came from

11  you and that they may be able to secure authenticating

12  testimony from a witness who has already been designated to be

13  deposed -- I don't know that -- as well as admissibility

14  predicates.

15  When we were talking on the telephone on -- was it

16  September 20th, I believe it was?

17  MR. CROSS:  Yes, Your Honor.

18  THE COURT:  What we all were talking about were

19  things that had been noticed.  There would be no discovery that

20  had not been noticed.  You wanted an extension of time, but I

21  wasn't going to open the door to new discovery, and both of you

22  agreed to that.

23  So if something was not noticed -- and noticed has a

24  meaning.  It does not mean that the opposing side knows that

25  it's coming.  It means that a notice has been issued.  If a

1   notice wasn't issued as of September 20th, then there's no

2   discovery allowed on that person who was not noticed.  Are we

3   clear on that?

4           MR. CROSS:  If I may, Your Honor, I worry we may not

5   be, and the reason is this:  Kolon seems to take the position

6   that sending us, for example, unsigned drafts at 11:40 at night

7   by email on a Monday constitutes notice even though they serve

8   it the next day, and the problem is, they've taken inconsistent

9   positions.

10          When they first served any Rule 45 subpoenas, they

11  didn't send them to us at all at Crowell & Moring.  They only

12  served them by hand on our counsel at McGuireWoods.

13          They defended that by saying, well, in part it was

14  oversight, but also saying, I guess we don't have to serve you

15  even though we had a long-standing practice of doing that,

16  sending things by email.  So they seem to be using it both

17  ways, saying we don't have to serve you by email, but if we do

18  serve you by email, that constitutes notice.  We're also

19  concerned --

20          THE COURT:  What does the rule say about when

21  something is noticed?

22          MR. CROSS:  My understanding is notice is upon

23  service.  That has always been my understanding.

24          THE COURT:  What does the law say?  Your

25  understanding doesn't make a whole lot of difference.

1          MR. CROSS:  I understand, Your Honor.

2          THE COURT:  It's when the notice is issued.  That's

3   what you all were talking about, and the issuance of a notice

4   means the issuance of the notice to the deponent.  It doesn't

5   mean sending a copy of it to the other side and saying, we're

6   thinking about sending these.

7          It says, these are issued to the person who is going

8   to be deposed, and if they were issued to the person who was

9   going to be deposed on September 20, then they can be taken.

10  If they were not issued to the person who was going to be

11  deposed on September 20th, they cannot be taken.  That's what

12  we were all talking about.  That's the rule.

13         MR. CROSS:  Thank you, Your Honor.

14         THE COURT:  And it makes no difference whether they

15  actually got service of process on that notice or not, because

16  what we were talking about was what was noticed as of the time

17  we were talking on September 20th.  That's what we all

18  understood, and that's what the transcript shows beyond

19  question.

20         Now, that notice applied to what?  Depositions;

21  right?

22         MR. CROSS:  Yes, sir.

23         THE COURT:  Notices don't govern subpoenas duces

24  tecum, but there was a statement that you made, Mr. Cross, in

25  your part of the transcript about subpoenas that had been

1    issued by that time.

2            So subpoenas go under the same rule, and a subpoena

3    is issued when it is issued out of the court, and I believe now

4    it's harder to determine that because lawyers can issue

5    subpoenas without going through the clerk of the court.  I'm

6    not sure any of you even remember when you had to do that.

7            But if a subpoena was issued to somebody, then that

8    subpoena is within the reach of the extension, and discovery

9    can be had with respect to it.  If it was not, it was not.

10   We're not going to do it.  That's what was agreed to.  Now,

11   that takes care of that issue, does it?  Have I made it clear,

12   Ms. Walworth?

13           MS. WALWORTH:  Yes, it is clear, Your Honor.  Thank

14   you.

15           THE COURT:  Mr. Cross?

16           MR. CROSS:  Yes, Your Honor, with one caveat, and I

17   apologize.  There seems to be a dispute over Mr. Pascal Renaud

18   which has arisen in their reply.  Mr. Renaud is a former

19   employee who is not under the control of DuPont.  We did

20   voluntarily produce him in the trade secrets case --

21           THE COURT:  He lives in France now.

22           MR. CROSS:  That is correct.  They have known that

23   for a very long time.  They requested contact information and

24   address for him, presumably to serve process through whatever

25   international means would be appropriate.  We provided that.

1   They then, without notice, served -- or without discussing it

2   served initially a deposition notice for him.  They then served

3   a subpoena on McGuireWoods.  It was not authorized to accept

4   service.

5            THE COURT:  For him?

6            MR. CROSS:  For him, and then late in the day on the

7   22nd, they served a subpoena on us at Crowell & Moring.  Our

8   position is it is too late to pursue --

9            THE COURT:  Do you represent him?

10            MR. CROSS:  We are counsel -- Crowell & Moring -- he

11   has asked Crowell & Moring to represent him, but we have not

12   been authorized to accept --

13            THE COURT:  How can you represent him?  How can your

14   firm represent him and represent DuPont at the same time?

15            MR. CROSS:  We did that before in the trade secrets

16   case.  He and DuPont did not consider it a conflict, Your

17   Honor.  He's a former employee.

18            THE COURT:  Okay.

19            MR. CROSS:  But we are not authorized to accept

20   service, and we have no control to bring him here.

21            THE COURT:  The subpoena wasn't issued on

22   September 20th anyway.  It was issued on September 22nd, you

23   said.

24            MR. CROSS:  That is when we received it, on

25   September 22nd, correct.

1        THE COURT:  Okay.  Solved.  Mr. Renaud was deposed in

2   the other case, wasn't he, and his deposition can be used in

3   this case to the extent it's useful.  I believe we've already

4   ruled on that.

5        Now, what do you say about Mr. Renaud?  According to

6   him, according to Mr. Cross, you didn't do anything until

7   September 22nd.  That's when you issued the subpoenas to these

8   people.

9        MS. WALWORTH:  I have the notice --

10        THE COURT:  Did you do a notice of deposition?

11        MS. WALWORTH:  Yes, we did, Your Honor.

12        THE COURT:  What date did you issue the notice?

13        MS. WALWORTH:  On September 20th.  It's right here in

14   front of me.

15        THE COURT:  What time?  Before or after that

16   telephone call?

17        MS. WALWORTH:  It was before, Your Honor, I'm sure.

18        THE COURT:  Before the telephone call.

19        MS. TRIMMER:  Yes, Your Honor, we issued --

20        THE COURT:  All right.  So the notice was issued, but

21   you didn't get any -- you have to serve this fellow because

22   just issuing a notice doesn't get him there because he's not

23   under their control.

24        MS. WALWORTH:  Your Honor, actually, he has

25   demonstrated that he is under their control, because as a

former employee and while represented by Crowell & Moring, they
produced him in Belgium for a deposition.

THE COURT: He voluntarily appeared in Belgium, if I
remember correctly, is what happened.

MS. WALWORTH: Mr. Renaud is a very important witness
in this case, Your Honor. He's the author of a number of
important documents.

THE COURT: Ms. Walworth, I don't care how important
he is. At this juncture, the rules are the rules. A deal is a
deal, and that's what it is.

MS. WALWORTH: Well, actually, there's no agreement
yet, Your Honor, but I would note that he is --

THE COURT: What do you mean, there's no agreement?
You reached an agreement on September 20th.

MS. WALWORTH: I'm sorry. When you said a deal is a
deal, I thought you were suggesting that there was an agreement
here, and I just --

THE COURT: You mean as to his deposition?

MS. WALWORTH: As to his deposition.

THE COURT: There clearly is not any agreement.

MS. WALWORTH: But, Your Honor, he was and is
represented by Crowell & Moring and who produced him in
Brussels for a deposition in the trade secrets case. They
could do the same, Your Honor, here.

He cannot be deposed in France because there's a

1    blocking statute in France that specifically says you can't

2    collect information in France for litigation pending outside of

3    France.

4              THE COURT:  Ms. Walworth, this man has been known to

5    you as an important witness in your antitrust case for a long

6    time.  I remember his memo, memos that you cite in some of your

7    papers, and they were in the -- a number of them were in the

8    trade secrets case, and they were referred to early on having

9    to do with competitive intelligence and a number of other

10   things, and you all could have gotten this taken care of a long

11   time ago, and if you didn't, you didn't.  If it is your

12   position that he is under the control of DuPont, then you can

13   brief that, and I'll address it.

14             MS. WALWORTH:  Thank you, Your Honor.  May I ask in

15   the alternative, after Your Honor addresses that, is I will

16   need an authentication witness for his documents or an

17   agreement on authentication.  In so many courts, counsel just

18   work out authentication issues between themselves.

19             THE COURT:  Well, unfortunately, your side set the

20   tone in the trade secrets case, and you wouldn't address any

21   authentication, and I had to listen to I don't know how many

22   hours of translated testimony because you wouldn't agree to

23   authentication.  So you may be living by the other side of that

24   now.  I don't know.  I can't help you with that.

25             I do have one other question that I don't understand,

1  and while you're there...

2          MS. WALWORTH:  Yes, Your Honor.

3          THE COURT:  You refer in your papers to leave to

4  submit a single substitute.

5          MS. WALWORTH:  Yes, Your Honor.

6          THE COURT:  And I don't even understand what that

7  means.  Can you help me?

8          MS. WALWORTH:  Yes, I can, Your Honor.  When counsel

9  entered into the agreement that there would be 15 depositions,

10 I understood there would be 15 depositions, not -- and instead,

11 Crowell & Moring issued 29 notices within the deadline and now

12 takes the position that they can pick and choose between those

13 29 which they will notice.

14          I understood our agreement to mean I could only issue

15 15 notices, and I had to pick my witnesses right then and

16 there.  I still don't know which of those 29 they intend to

17 pick and choose, and my request is that --

18          THE COURT:  Say that again.

19          MS. WALWORTH:  I still don't know which of the 29

20 witnesses they noticed, notwithstanding our agreement for 15 --

21          THE COURT:  When are they going to tell you that?

22 Did you ask them that?

23          MS. WALWORTH:  Yes, I have.

24          THE COURT:  Mr. Cross, when are you going to tell her

25 out of the 29 what your choices are?  What is this; some kind

1  of fancy football game or something?  Let's go.

2  MR. CROSS:  Not at all, Your Honor.  This is the

3  first request we've gotten as to when we're going to do it.

4  THE COURT:  Actually, Mr. Cross, I don't know that

5  it's the first request you've gotten, but it isn't the first

6  time she's moaned about it, I can tell you that right now.

7  MS. WALWORTH:  That is true.  This came up on the

8  call on September 22nd.  There was no request at that point for

9  them --

10  THE COURT:  Well, why didn't you just tell them?

11  MR. CROSS:  Your Honor, because it comes back to the

12  reason why we served so many.  The biggest driver of this, what

13  really put us over the number is we had to serve multiple

14  subpoenas on their third-party agents, because it was unclear,

15  and because we don't have their documents it is still unclear

16  whether we need to depose them as a corporate entity or as

17  individuals, so we had to notice both, and that's what drives

18  the number up.  There is six or seven agents.  We had to serve

19  at least two subpoenas, I think, on each, and with some of them

20  there were two employees.

21  THE COURT:  So it's the deposition of the same

22  person, one noticed corporately and one noticed individually;

23  is that what you are talking about?

24  MR. CROSS:  That is correct, Your Honor.

25  THE COURT:  Ms. Walworth, that's within your control

1 to figure out how to handle that. That's something you can

2 work out.

3 MR. CROSS: As soon as we get whatever documents we

4 work out -- either way, we will let them know by the end of

5 next week, which is still three and a half weeks before the

6 close of fact discovery, I think. We will let them know what

7 we're going to do. Hopefully by then, we'll have some

8 resolution on whether we're getting more documents from third

9 parties or not, but we will do that.

10 THE COURT: You mean from your subpoenas. They're

11 already in default of the September 16th order, and I'm not

12 going to hear more about it on this. If you want to receive

13 your subpoenas, that's perfectly all right with me as long -- I

14 don't care.

15 MR. CROSS: Understood, Your Honor.

16 THE COURT: I don't want to hear any more about it.

17 When do you want to file this brief, Ms. Walworth, on Mr.

18 Renaud?

19 MS. WALWORTH: Friday of next week.

20 THE COURT: Okay.

21 MR. CROSS: Your Honor, may I be heard on that for

22 just a moment?

23 THE COURT: Heard about what?

24 MR. CROSS: Is it really necessary to brief this? We

25 just went through a brief on their current employees, and they,

1    themselves, have argued that a party has an obligation to

2    produce only an officer, director, or managing agent.  They

3    took that position.

4           How in the world could it be that we, as DuPont,

5    would have any obligation to produce a former employee?  He's

6    not an officer, he's not a director, and he's obviously not a

7    managing agent.

8           THE COURT:  I understand that, Mr. Cross, but I'm not

9    going to do that now.  I'm not going to rule right now.  I want

10   you to get back to your depositions.  I've extended the hours

11   of the courthouse.

12          Ms. Walworth might realize that she is taking a

13   position inconsistent with what she took, and she may -- she

14   may realize that could be expensive.  She may also say that the

15   Court's rulings changed the situation.  I don't know what she's

16   going to do.  It's an important witness to them, and, yes,

17   they're going to have an opportunity to brief it.  October

18   what, 7th; is that right?

19          MS. WALWORTH:  Yes, Your Honor, it is the 7th.

20          THE COURT:  Your file your response on the 14th, and

21   you file your reply on the 21st.

22          MS. WALWORTH:  Thank you, Your Honor.

23          THE COURT:  Anything else that we need to do?

24   Everything that is pending is all cleaned up now; right?

25          MR. CROSS:  Everything pending, yes, Your Honor.

1    MS. WALWORTH:  Yes, Your Honor, it is.  Thank you.

2    THE COURT:  You're going to have to understand

3  something.  A magistrate coming into this case cold simply is

4  not going to be very well equipped to deal with the problems

5  that you've got the way that they've been dealt with before, if

6  that mode obtains, so I suggest you all try to work together

7  and get it sorted out, because you'll get a better resolution.

8    MR. CROSS:  Your Honor, I just want to get on the

9  record so there's no argument about waiver later, we do have a

10  live dispute.  We're not going to present it to the Court today

11  unless Your Honor wants to hear it.

12    We made a request for images and dumpster files for

13  the individuals who have not produced documents that are

14  identified in their initial disclosures.  We just got a letter

15  back late last night in response to the letter we sent one or

16  two weeks ago requesting this, and they seem to be saying

17  they're not going to produce it.

18    We can argue it now.  I'm sure Your Honor wants to

19  get those things.  I just don't want anyone saying later we

20  waived any right to this because we didn't raise it today, but

21  that's going to be a dispute.  I hope we can resolve it.  If

22  not --

23    THE COURT:  I hope you resolve it, too.  If you

24  don't, file your brief on the same schedule she's going to

25  brief Renaud, and you all reverse the dates.

1            MR. CROSS:  Thank you, Your Honor.

2            MS. WALWORTH:  Thank you, Your Honor.

3            THE COURT:  That's called images of their computers?

4            MR. CROSS:  Yes.

5            THE COURT:  And dumpster files.

6            MR. CROSS:  Yes, Your Honor.

7            THE COURT:  Who are they?  For people who?

8            MR. CROSS:  I apologize.  I don't have the letter in

9    front of me.

10           THE COURT:  People who they identified in the Rule 26

11   disclosures?

12           MR. CROSS:  I believe all of them -- I believe all of

13   them are identified in the initial disclosures, and they are

14   individuals who have either not produced any documents or have

15   produced a very, very small set of documents.  I think that's

16   our -- where it is.  We have the letter.

17           THE COURT:  I'm sure Ms. Walworth will think that

18   through and see the wisdom of perhaps working an accommodation

19   with you.  We'll be in recess.

20

21                    (End of proceedings.)

22

23

24

25

1

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7   _____/s/_____          _____

    P. E. Peterson, RPR                    Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25