IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KOLON INDUSTRIES, INC.,

    Plaintiff,

v.                          Civil Action No. 3:11cv622

E.I. DU PONT DE NEMOURS
AND COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the MOTION FOR SUMMARY JUDGMENT (Docket No. 254) filed by E.I. du Pont Nemours and Company ("DuPont"). For the reasons set forth below, DuPont's motion will be granted and the counterclaim will be dismissed with prejudice.

## PROCEDURAL HISTORY

On February 3, 2009, DuPont filed a Complaint against Kolon claiming, inter alia, that Kolon had "engaged in concerted and persistent actions to wrongfully obtain DuPont's trade secrets and confidential information about [DuPont's] KEVLAR [] aramid fiber." Compl. ¶ 1. DuPont also alleged claims for conspiracy, business torts, and conversion. All claims, but the trade secret misappropriation claim, were dismissed either voluntarily by DuPont before trial or upon motion by Kolon before the case

was submitted to the jury.  Hereafter, the action by DuPont will
be referred to as the "Trade Secrets Case."

On April 20, 2009, Kolon filed its ANSWER and a
COUNTERCLAIM alleging that DuPont had violated Section 2 of the
Sherman Act, 15 U.S.C. § 2, by engaging in anticompetitive
activity, attempted monopolization (FIRST CAUSE OF ACTION) and
monopolization (SECOND CAUSE OF ACTION).  See Defs.' Answer at
35.  DuPont filed a MOTION TO DISMISS the antitrust counterclaim
which was granted, with leave to amend.  On August 25, 2009,
Kolon filed its AMENDED COUNTERCLAIM (Docket No. 50); and on
August 31, 2009, Kolon filed its SECOND AMENDED COUNTERCLAIM
("SACC") (Docket No. 59) which was dismissed, again for failing
to state a claim, but also with leave to amend (Docket No. 100).

Kolon declined to further amend the counterclaim and, after
the Court entered an Order under Fed. R. Civ. P. 54(b), Kolon
appealed the dismissal of the counterclaim.  On March 11, 2011,
the United States Court of Appeals for the Fourth Circuit
decided that Kolon adequately had pled antitrust claims of
monopolization and attempted monopolization and remanded the
matter for further proceedings.  E.I. du Pont de Nemours and Co.
v. Kolon Industries, Inc., 637 F.3d 435 (4th Cir. 2011).  The
counterclaim will be referred to as the "Antitrust Case."
Following remand, the parties engaged in several months of

discovery.    Thereafter, DuPont filed this motion for summary judgment.

## BACKGROUND FACTS

The following generally applicable facts are either undisputed or recited giving all favorable inferences to Kolon, the non-moving party.  Other facts will be recited in the legal analysis to which they are pertinent and those facts also are either not in dispute or recited giving all favorable inferences to Kolon.

The product at issue in the Antitrust Case, as well as the Trade Secrets Case, is para-aramid fiber.  Dupont's para-aramid product is Kevlar.  Kolon's corresponding product is Heracron.

Para-aramid fiber is a high-strength, non-conductive, lightweight material with no melting point and high resistance to abrasion.  Production of para-aramid is very time-intensive and expensive.  Typically, a seller of para-aramid must "qualify" its product with a purchaser before the product can be sold.  This involves laboratory testing, in-use testing in the customer's product, and in-use testing on a larger scale, and it takes anywhere from six months to three years.  See Mem. Supp. Summ. J. SOF ¶ 11 (uncontested fact); Opp. Summ. J. at 4-5.  The para-aramid product comes in three general forms: filament (yarn), staple (yarn cut into short pieces); and pulp (yarn cut

3

up then manipulated, which comes in both wet and dry varieties).
Mem. Supp. Summ. J. SOF ¶ 1.   In 1965, DuPont invented para-
aramid fiber.   DuPont began production of its para-aramid fiber
in 1971 and trademarked its product Kevlar in 1973.   Id. at 3.

Para-aramid fiber is used in, amongst other things, tires,
fiber optic cables, body armor, cables, sporting goods, and
automotive belts, hoses, and gaskets.   DuPont was the only
manufacturer of para-aramid in the United States from 1971 until
the 1980s.   Mem. Supp. Summ. J. SOF ¶ 2.   At that time, Akzo
N.V., a Dutch company, which was later purchased by Teijin
Aramid, sought to introduce its para-aramid product, Twaron,
into the United States market.   Teijin started selling Twaron in
the United States and worldwide in 1987.   From 1990 to 2009,
Teijin's share of the United States para-aramid market increased
as DuPont's share decreased.   By 2006, Teijin controlled 41
percent of the United States market, and by 2009, it controlled
44 percent of that market.   See Mem. Supp. Summ. J. at Exhibit
21, Dr. Bamberger Rpt. at 17.   Teijin surpassed DuPont in the
worldwide para-aramid market in 2006.   DuPont's global market
share went from 91 percent in 1990 to 46 percent in 2006.   Reply
Mem. Supp. Summ. J. at 7 n. 3.   DuPont's share in the United
States went from 100 percent to 59 percent during that same time
period.   Mem. Supp. Summ. J. at 5 at Exhibit 21, Dr. Bamberger

4

Rpt. at 16.   By 2009, DuPont's market share in the United States had decreased further to 55 percent. Id.

In 2006, Kolon began producing its para-aramid product, Heracron, and thereafter started to market it in the United States.   SACC ¶ 8 (Docket No. 2); Opp. Summ. J. at 6.[1]   To that end, Kolon engaged seven sales agents in the United States: Aramid Fiber Systems (Michael Mitchell), Gane, Inc. (H.K. Jung), K-Tex, LLC (Joe Kaminsky), KTL Trading Resource (Bruce Lindley), Scarponi Textiles (David Scarponi and David Murphy), Sekka-Tex (Brian Seekamp), and Techtrade (Steve S.K. Chung).   In its SACC, Kolon alleged that:

> DuPont's substantial market power is evidenced by its historic market shares, a shortage of U.S. supply and high U.S. prices for Kevlar.   Upon information and belief, DuPont's market share remains greater than 70% of all sales by purchase volume of para-aramid.   ¶ 17.

> The relevant product market is the market for para-aramid fibers . . . .   ¶ 18.

> The relevant geographic market is worldwide supply of para-aramid fiber to commercial purchasers in the United States . . . .   ¶ 24.

---

[1]   Kolon had attempted for several years in the 1990's to develop a commercial para-aramid product.   That effort was unsuccessful and in 1995 Kolon abandoned the effort.   See Sept. 7, 2011 Trade Secrets Case Trial Tr. at 5067 (3:09cv58); Kolon's Opp. Permanent Injunction at Exhibit 3 (3:09cv58) (Docket No. 1641). It resumed the effort in approximately 2004. Id.

> Over the past three years, for example,
> DuPont committed various high volume U.S.
> para-aramid fiber buyers to multi-year
> supply agreements that required the customer
> to purchase from 80% to 100% of the
> customer's requirements from DuPont (¶ 29) .
> . . the depressed supplier acceptance caused
> by DuPont's long-term supply arrangements
> has reduced Kolon's sales volume and
> consequent market share to a level
> significantly lower than it would have been
> in the absence of these arrangements (¶ 34).

In sum, the central allegation of Kolon's case is that DuPont's use of long-term, multi-year, supply contracts with high volume para-aramid purchasers from January 2006 to April 20, 2009 (the relevant time period)[2] were evidence of attempted monopolization and monopolization of the para-aramid market (the relevant product market) in the United States (the relevant geographic market). See also E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc., 637 F.3d 435 (4th Cir. 2011) (reviewing the SACC and noting that Kolon had alleged that DuPont violated the Sherman Act through the use of exclusive contracts with high-volume customers).

---

[2]  The relevant time period begins when Kolon says it first attempted to enter the relevant market and ends on April 20, 2009, the date on which Kolon first filed the counterclaim in the Antitrust Case.  Kolon does not dispute that the relevant supply agreements are those within the January 2006 to April 20, 2009 time frame. See Mem. Opp. Summ. J. at 5 n. 5.  Kolon disputes whether it is confined to the 2006 to 2009 time period to show its harm for the purposes of damages calculation.  That, however, is a moot point given that DuPont's motion for summary judgment will be granted.

The foregoing facts form the basic context for the assessment of DuPont's motion for summary judgment.  Other facts will be outlined in the discussion of the analytical component to which they relate.

## THE POSITION OF THE PARTIES

In its First Cause of Action, Kolon alleges that, during the relevant period, DuPont monopolized the para-aramid market in the United States.  DuPont raises five contentions in support of its motion for summary judgment on the monopolization claim: (1) Kolon has not proven that DuPont possessed monopoly power during the time period in question; (2) Kolon has not proven harm to competition; (3) there is no evidence of substantial market foreclosure; (4) Kolon does not have standing to pursue its claims because it cannot prove antitrust injury and because it was not a lawful competitor of DuPont during the relevant time period; and (5) Kolon cannot prove damages.

First, DuPont points out that Kolon's own expert, Dr. Bamberger, estimated that DuPont's relevant share of the market was no more than 59 percent during the relevant time period. Mem. Supp. Summ. J. at 28.  According to DuPont, decisional law in the Fourth Circuit establishes that at least 70-75 percent market share is required to support a finding of monopolization. Id. (citing R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199

7

F. Supp. 2d 362 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th Cir. 2003); E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 450 (4th Cir. 2011) (quotations omitted)). DuPont also emphasizes that Teijin, its major competitor, obtained a majority share of the global para-aramid market in 2006, and that Teijin's market share continued to increase as DuPont's market share decreased during the relevant time period. Id. at 29.

Second, DuPont argues that Kolon has not satisfied its burden of showing harm to competition. DuPont points out that Kolon's own expert testified that any harm occurred after the relevant time period; and, according to DuPont, the fact that no harm took place during the relevant time period eliminates the basis for Kolon's Counterclaim. Id. at 30.

Third, DuPont claims that none of its agreements with customers excluded Kolon from a "substantial share" of the market. Id. at 31 (citing Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1987) (citing Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961))). According to DuPont, Kolon has not quantified any portion of the relevant market that DuPont allegedly foreclosed. Id. at 32. Kolon's expert, Dr. Bamberger, testified that the only United States customers that could have been foreclosed by DuPont are those with whom Kolon attempted to become qualified who then

8

declined Kolon's business for reasons related to DuPont's activities. Id. at 33. DuPont points out that Kolon attempted to become qualified with nine such customers during the relevant time period, eight of which had no supply agreement with DuPont, and one of which declined Kolon's business because of Kolon's price increase. Id. at 33-34. Finally, on this point, DuPont says that, wholly apart from Dr. Bamberger's testimony, Kolon's own witnesses identified only three customers (out of nearly 1,000 commercial customers) with whom Kolon allegedly could not do business. Id. at 34.[3] According to DuPont, Kolon has not shown any market foreclosure, and it has not come close to establishing the minimum threshold. Id. (citing R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 388 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th Cir. 2003) (noting that "provisions involving foreclosure as high as 50% have been upheld")).

Fourth, DuPont contends that Kolon does not have standing because it cannot show that its commercial activities as a competitor were lawful, and also cannot show that it would have

---

[3] According to DuPont, these three customers were: (1) Goodyear, which rejected Kolon's products because of poor quality, and which, therefore, did not qualify Kolon's products; (2) Akebono, which sought Kolon's business but was told that Kolon did not have sufficient supply; and (3) OFS, which requested bids from Kolon, DuPont, and Teijin for a supply contract, and which was told by Kolon that Kolon did not have sufficient supply to fulfill the contract and therefore was not submitting a bid. Id. at 34-36.

had more customers <u>but for</u> DuPont's allegedly unlawful supply contracts. <u>Id.</u> at 37. <u>See</u> <u>Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.</u>, 113 F.3d 405, 415 (3d Cir. 1997). According to DuPont, Kolon could not make sales because of its low quality products, lack of supply, long shipment times, high prices, and practice of requiring full payment before shipping. <u>Id.</u> at 39-40.

Fifth, DuPont contends that Kolon has not shown, and cannot show, damages. Because Kolon lacked the capacity to make any alleged "lost sales," there are no possible damages. <u>Id.</u> at 42. Even if there were, says DuPont, Dr. Bamberger has used Kolon's European market share as a predicate for determining damages in the United States, which is inappropriate considering that the United States market (and Kolon's business in it) is considerably different from the European market. <u>Id.</u>[4]

Unsurprisingly, Kolon suggests several reasons why DuPont's motion should be denied.

First, Kolon argues that DuPont's share of 54 to 59 percent of the market is enough to establish monopolization when coupled with the high barriers to entry in the United States para-aramid

---

[4] DuPont also notes that, even if Kolon could show a monopoly, damages, harm to competition, and foreclosure, it cannot show that DuPont's activities were not "procompetitive." According to DuPont, market foreclosure can be justified when it is "procompetitive." (<u>citing</u> <u>Chuck's Feed</u>, 810 F.2d at 1294). DuPont claims its supply agreements were economically beneficial, ensuring stable supply and pricing. <u>Id.</u> at 44.

market, the market's highly concentrated nature, DuPont's use of price discrimination, and DuPont's alleged decision to shut down production to control prices.  Opp. Summ. J. at 3, 28 (citing Reazin v. Blue Cross & Blue Shield of Kan., 899 F.2d 951, 968 (10th Cir. 1990); Defiance Hosp. v. Fauster-Camron, Inc., 344 F. Supp. 2d 1097, 1113 (N.D. Ohio 2004); Hayden Pub. Co. v. Cox Broad. Corp., 730 F.2d 64, 69 (2d Cir. 1984); Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 489 (5th Cir. 1984)).  See also id. at 29 (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 2012 (3d Cir. 1992)).

Second, Kolon submits that supply agreements, by their very nature, result in foreclosure of the market.  Id. at 3, 31 (citing LePage's, Inc. v. Minnesota Mining & Mfg., 324 F.3d 141, 147 (3d Cir. 2003) (citations omitted)).

Third, Kolon argues that it need not show that DuPont foreclosed any quantum of the market in order to prevail, so long as it shows that DuPont severely restricted the market. Id. at 33. (citing LePage's, 324 F.3d at 161-62); United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328-29 (1961)). Fourth, Kolon argues that DuPont's anticompetitive conduct prevented it from conducting business with Goodyear, AFL, Corning, Akebono, Federal Mogu, Nisshinbo, Garlock, and Hollingsworth & Vose.  Fifth, Kolon contends that DuPont is

guilty of "attempted monopolization" because DuPont had a "dangerous probability" of achieving a monopoly.  Id. at 36-37.

Sixth, Kolon contends that it has presented adequate evidence of damages because there is "sufficient evidence of causation," Perkins v. Standard Oil Co. of Cal., 395 U.S. 642, 648 (1969), and because "the illegality" was "a material cause of [Kolon's] injury." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9 (1969).  Kolon points out that its market share in Europe is seven times as high as its market share in the United States.  Id. at 39.

Seventh, Kolon argues that it can show harm to competition because it can show that consumers now have less choice about who they purchase para-aramid products from, and because it can also show that, in 2011, it was forced to suspend the TROY-2 expansion project, which would have doubled Kolon's manufacturing capacity for Heracron and reduced prices for the product for consumers.  Id. at 40.

Eighth, Kolon rejects DuPont's argument that its activity was procompetitive, claiming that stable supply and pricing could have been achieved without the near-exclusive contracts used by DuPont.  Id. at 41.

Ninth, Kolon contends that it does have standing because public policy favors antitrust suits and promoting fair competition and because a plaintiff's conduct cannot bar it from

12

asserting an antitrust action. Id. (citing Burlington Indus., Inc. v. Milliken & Co., 690 F.2d 380, 388 (4th Cir. 1982); Memorex Corp. v. Int'l Business Machines Corp., 555 F.2d 1379 (9th Cir. 1977)).

Finally, Kolon contends that DuPont's motion is premature because of the ongoing discovery disputes and outstanding motions related thereto. Id. at 43 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986); Phillips v. Gen. Motors Corp., No. 89-2210, 1990 WL 117981, at *4 (4th Cir. Aug. 16, 1990); Ingle v. Yelton, 439 F.3d 191, 196 (4th Cir. 2006)). Kolon asks the Court to deny or stay the summary judgment motion pursuant to Rule 56(d) until the resolution of Kolon's pending motions to compel and pending receipt by Kolon of any subsequently ordered discovery. Id. at 45.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is an important tool for dealing with antitrust cases." See Oksanen v. Page Memorial Hosp., 945 F.2d 696, 708 (4th Cir. 1991) (citing Steuer v. National Med. Enterps., Inc., 672 F. Supp. 1489, 1500-01 (D.S.C. 1987) (noting that the Supreme Court and the Fourth Circuit have found summary judgment to be important in deciding antitrust cases)); see also Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1322 (4th Cir. 1995) ("Because of the unusual

13

entanglement of legal and factual issues frequently presented in antitrust cases, the task of sorting them out may be particularly well-suited for Rule 56 utilization."). Granting summary judgment is appropriate where there is no genuine issue as to any material fact in a case. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) ("Rule 56 must be construed with due regard [] for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury."). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id.

Hence, summary judgment is only appropriate when, after discovery, the non-moving party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. When a motion

14

for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party. Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996).

Nevertheless, a party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp., 477 U.S. at 327.

In sum, summary judgment is called for when no reasonable jury could return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 47 U.S. 242, 248-49 (1986). When the fact record is in that posture on a claim, or on an element of a claim, the non-moving party cannot prevail as a matter of law. Id.; Celotex, 477 U.S. at 322.

## DISCUSSION

### A.   Preliminary Matters

There are three preliminary matters that must be addressed before considering the substance of the summary judgment motion. First, Kolon argues that the motion is premature and ought to be deferred pursuant to Rule 56(d). Second, DuPont contends that

its motion should be granted because Kolon's response brief is in violation of Local Civil Rule 56(B) which requires a brief in opposition to summary judgment to contain a section that confronts – item by item – each fact that the movant shows to be undisputed and supports that response by listing record citations proving the dispute.    Third, DuPont contends that Kolon lacks standing to assert an antitrust claim because, in the Trade Secrets Case, Kolon was found to have acted wrongfully in misappropriating DuPont's trade secrets.

### 1.    Fed. R. Civ. P. 56(d)

Kolon argued in its brief opposing summary judgment that, pursuant to Rule 56(d), the Court should stay or deny DuPont's motion for summary judgment.    Rule 56(d) gives the Court discretion to defer or deny consideration of a summary judgment motion "if a nonmovant shows by affidavit or declaration, that, for specified reasons, it cannot present facts essential to justify its opposition."[5]

Courts look to whether the nonmovant's requested information has the potential to "create [] a genuine issue of

---

[5] In 2010, the Federal Rules of Civil Procedure were revised, and Rule 56(d) replaced Rule 56(f).    Committee Notes on Rules – 2010 Amendments ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).").    Rule 56(f) provided that, if a party, for good reason, could not present facts "essential to justify the party's opposition," the Court could stay a summary judgment motion to allow for further discovery.

material fact sufficient to defeat summary judgment," whether the sought-information is "the subject of pending discovery requests," and whether the information is "wholly within the defendants' possession" to determine whether to stay proceedings under Rule 56(d). Ingle v. Yelton, 439 F.3d 191, 197 n. 2 (4th Cir. 2006) (quoting Strag v. Bd. of Trustees, 55 F.3d 943, 954 (4th Cir. 1995)); see also Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (describing the Court's discretion to postpone a decision on summary judgment in situations where a plaintiff "needs additional discovery to explore 'facts essential to justify the party's opposition.'") (citing Rule 56(f)).

Exhibit 74 to Kolon's opposition brief, the Declaration of Daniel Goldman, articulated Kolon's reasons for asking the Court to postpone consideration of, or to deny, DuPont's summary judgment motion. The affidavit identifies several specific then-pending discovery motions as warranting denial or deferral under Rule 56(d). The Court resolved all of those motions, with one exception, in February, granting some and denying others.[6]

---

[6] The Court waited to address one of the motions upon the request of the parties, who represented that they believed they could come to an agreement on the issues therein. The only unresolved issue goes to specific intent, an element of the attempted monopolization claim. However, as explained below, the Court has assumed, for purposes of the summary judgment motion, that a triable issue of fact on the specific intent element has been made out. Thus, any additional discovery Kolon might receive before trial helping it prove specific intent would not aid the Court in deciding summary judgment.

The discovery motions that formed the basis for the Rule 56(d) request will be briefly addressed below.

### a.   Long-Term Supply Agreements

First, in its opposition brief, Kolon argued that the Court should delay or deny summary judgment because its Motion to Compel Production of Documents (Docket No. 133) was still pending.  In that motion, Kolon contended that DuPont had failed to produce all of the 2008 supply agreements that were requested in its Second Set of Requests for Production.  Opp. Summ. J. at Exhibit 74, ¶¶ 5-6.  To make that point, Kolon relied on a PowerPoint presentation conducted by a DuPont employee suggesting that 36 such agreements existed.  Id. ¶ 6.  The Court granted Kolon's motion in part on February 22, 2012, ordering DuPont to turn over all relevant 2008 contracts (Docket No. 402).

### b.   Pricing Data and High Variable Margins

Kolon next contended that the pricing and margin-related data it requested in its Motion to Compel Production of Economic and Financial Data (Docket No. 145), which it claimed it also requested in its First Set of Interrogatories, its Second Set of Requests for Production, and its Third Set of Requests for Production, was essential to proving monopoly power.  Id. ¶¶ 10-11.  On February 23, 2012, the Court granted Kolon's Motion to Compel with respect to Interrogatory No. 9 and Request No. 17,

18

and denied Kolon's Motion to Compel in all other respects.
(Docket No. 406).   Interrogatory No. 9 requested "aggregate"
gross and net profits and Request No. 17 concerned worldwide
pricing data.

### c.   DuPont's Lobbying Efforts, the ITC Proceedings, and Akzo Litigation

Kolon also argued that the Court should employ Rule 56(d)
because of its then-pending request for Rule 30(b)(6) deposition
testimony and third-party subpoenas (Docket No. 139) respecting
Dupont's lobbying efforts, certain 1987 ITC proceedings, and the
patent litigation between Akzo and DuPont.   Kolon contended that
production of this discovery might help to establish DuPont's
specific intent to monopolize, an element of an attempted
monopolization claim.   Id. ¶ 14.

On March 13, 2012, the parties informed the Court that they
had reached an agreement concerning Kolon's Motion to Compel
30(b)(6) Deposition Testimony as to the lobbying and ITC points.
(Docket No. 139).   Thus, the only unresolved aspect of the
outstanding discovery was that relating to the patent litigation
between Akzo and DuPont.   After a hearing on Friday, March 16,
2012, the Court ordered Kolon to provide a list of all relevant
claims that DuPont had brought against Akzo, on which DuPont did
not prevail, that Kolon believed to be "sham litigation."   Mar.
16, 2012 Tr. 43.   If the Court found that the request had merit,

the Court advised that it would order DuPont to produce a witness to testify about the business reasons for bringing the alleged "sham litigations." Id.   Thereafter, Kolon submitted the list, and the Court concluded that three items on the list could be inquired of in a Rule 30(b)(6) deposition.   Order, Mar., 22, 2012 (Docket No. 539).   As Kolon has acknowledged, the issues to be examined on those three depositions may bear on the intent element of the attempted monopolization claim.   For purposes of determining DuPont's motion for summary judgment, it will be assumed that there is a triable issue respecting intent. Thus, the pending Rule 30(b)(6) deposition on the allowed topic does not preclude consideration of the motion for summary judgment.[7]

### d. Pascal Renaud's Deposition

Finally, Kolon also asserted that the motion for summary judgment was premature because the Court had not yet decided a Motion to Compel the Deposition of Pascal Renaud, DuPont's former previous competitive intelligence manager.   Id. ¶ 15. Kolon had also filed a Motion for Issuance of Letters Rogatory

---

[7]   At one stage in the briefing process, Kolon argued that discovery into the patent litigations between Akzo and DuPont was relevant to the existence of monopolization.   Mem. Supp. Motion to Compel 30(b)(6) at 17 (Docket No. 140).   However, that conclusory argument was not supported in the Rule 56(d) affidavit.   See Opp. Summ. J. at Exhibit 74 ¶ 14.   Nor was it ever explained sufficiently to warrant allowing the deposition for that purpose.

to Pascal Renaud (Docket No. 113) in the event the Court denied the Motion to Compel that was still pending when Kolon filed its brief opposing summary judgment.   On February 22, 2012, the Court resolved both motions, issuing an Order denying Kolon's Motion to Compel and granting its request for Issuance of Letters Rogatory (Docket No. 401).

And, at the hearing on February 27, 2012, counsel for Kolon represented that taking the deposition of Pascal Renaud might take more than a month and that "at this point we would not be in favor of moving the trial date just because we think we have to take the deposition of Pascal Renaud."   Feb. 27, 2012 Tr. 32.

As the record now stands, the discovery motions on which Kolon sought delay of the summary judgment motion decision no longer stand as impediments to deciding the motion.   The summary judgment hearing was held on March 16, 2012, and, at that hearing, Kolon did not suggest that any of the February Orders had not been complied with, that it was in need of further discovery, or that it was not prepared to go forward with the motion.   Nor, after receiving the discovery ordered by the Court, did Kolon supplement its brief opposing summary judgment.

For the foregoing reasons, there is no reason under Rule 56(d) to defer deciding the motion for summary judgment or to deny it.   Hence, the motion will be decided on its merits.

21

## 2.   Local Civil Rule 56(B)

Local Civil Rule 56(B) provides that:

> (B) Summary Judgment – Listing Of Undisputed
> Facts:   Each brief in support of a motion
> for   summary   judgment   shall   include   a
> specifically captioned section listing all
> material facts as to which the moving party
> contends   there   is   no   genuine   issue   and
> citing the parts of the record relied on to
> support the listed facts as alleged to be
> undisputed.   A brief in response to such a
> motion   shall   include   a   specifically
> captioned section listing all material facts
> as   to   which   it   is   contended   that   there
> exists   a   genuine   issue   necessary   to   be
> litigated and citing the parts of the record
> relied on to support the facts alleged to be
> in dispute.
>      In   determining   a   motion   for   summary
> judgment,   the   Court   may   assume   that   facts
> identified   by   the   moving   party   in   its
> listing   of   material   facts   are   admitted,
> unless   such   a   fact   is   controverted   in   the
> statement   of   genuine   issues   filed   in
> opposition to the motion.

DuPont's   brief   in   support   of   the   motion   for   summary
judgment complied with the first sentence in the rule.   Kolon's
response did not comply with the second sentence, which imposes
duties on the non-moving party.

While Kolon's brief contained a section entitled "MATERIAL
CONTESTED FACTS," that section did not identify which of the
material facts asserted by DuPont as undisputed were thought by
Kolon to be in dispute.   Nor did that section set out citations
showing why there was dispute as to the facts that DuPont had
asserted (with record support) to be undisputed.   Instead, that

22

section of Kolon's brief was 24 pages of argument, positing some factual assertions that were followed by citations to the record and many others that were not. And, indeed, many of the factual assertions in that section were not in dispute but instead, were facts that DuPont asserted to be undisputed which Kolon merely recast in argumentative style.

That approach, predictably, made it difficult and time-consuming to sort out what, if any, facts really were in dispute and whether any asserted dispute was genuine or related to material facts. This kind of obfuscatory presentation is exactly what Local Civil Rule 56(B) is intended to prevent.

These violations of the local rule would warrant a finding that the facts listed by DuPont are not in dispute and, thereafter, a resolution of the motion in DuPont's favor. However, given the significance of summary judgment and considering the interest of justice, it is preferable to determine the motion on its merits, rather than on Kolon's breach of Local Civil Rule 56(B).[8]

### 3. Standing

DuPont contends that Kolon lacks standing because Kolon wrongfully appropriated DuPont's trade secrets. And, as evinced by the verdict in the Trade Secrets Case, Kolon certainly did

---

[8]  Violations of like kind by other litigants in other cases likely will not be met with as charitably by any judge of this Court.

misappropriate many of DuPont's trade secrets and has used them to its competitive advantage.  However, Kolon's wrongful conduct does not render DuPont immune from an antitrust suit by Kolon. See Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139 (1968) (explaining that "[t]he plaintiff who reaps the reward of treble damages [in an antitrust suit] may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition"); Burlington Indus., Inc. v. Milliken & Co., 690 F.2d 380, 388 (4th Cir. 1982) ("[U]nclean hands is no bar to antitrust recovery.").

## I.   THE MONOPOLIZATION CLAIM:   FIRST CAUSE OF ACTION

"To prove a Section 2 monopolization offense, a plaintiff must establish two elements:   (1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power . . . ."  E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011) (citing Eastman Kodak Co. v. Image Technical. Servs., Inc., 504 U.S. 451, 480 (1992) and Cavalier Tel., LLC v. Verizon Va., Inc., 330 F.3d 176, 183 (4th Cir. 2003)).  Of course, the monopoly power must exist in the relevant market.  Id. at 450.  For purposes of proceedings in this Court, the relevant product market is para-aramid fiber,

and the relevant geographic market is the United States.[9]   The defendant "must engage in conduct 'to foreclose competition, gain a competitive advantage, or to destroy a competitor.'" Id. (quoting Eastman Kodak, 504 U.S. at 480).

### 1.   Monopoly Power

A defendant possesses "monopoly power in the relevant market," if it is "truly predominant in the market." White Bag Co. v. Int'l Paper Co., 579 F.2d 1384, 1387 (4th Cir. 1974). The Fourth Circuit observed that:   "[p]redominance" is established in situations where the defendant controls "seventy to one-hundred per cent of the relevant market." E.I. du Pont de Nemours, 637 F.3d at 450 (quoting White Bag, 579 F.2d at 1387). In situations where the defendant controls less than seventy percent of the relevant market, it is unlikely that the plaintiff will be able to establish the requisite predominance. R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th Cir. 2003) ("Seventy to seventy-five per cent is generally considered the minimum market share necessary to support a finding of monopoly power.") (citing White Bag, 579 F.2d at 1387).

---

[9]  SACC ¶¶ 18, 24; Opp. Summ. J. at 4 ("The relevant market in this case is para-aramid fiber for commercial applications in the United States.").   The Fourth Circuit has approved this definition of the relevant market.

Notwithstanding the foregoing observations, there has been much discussion amongst and within circuits about whether a certain percentage market share dispositively resolves whether monopoly power is extant or nonexistent. The Supreme Court of the United States provided some guidance in United States v. United States Steel Corp., 251 U.S. 417, 444 (1920) in which it reasoned that no monopoly power could exist on a market share of less than 50 percent ("The power attained was much greater than that possessed by any one competitor – it was not greater than that possessed by all of them . . . monopoly, therefore, was not achieved . . ."). Since its decision in United States Steel, the Supreme Court has never found a party with less than 75 percent market share to have monopoly power. See Antitrust Laws & Trade Regulation: Desk Ed. § 3.02 (2011).

Judge Learned Hand, evaluating the issue for the Second Circuit, concluded that, although a market share of over 90 percent is enough to constitute a monopoly, "it is doubtful whether sixty or sixty-four per cent" is sufficient "and certainly thirty-three percent is not." United States v. Aluminum Co. of Am., 148 F.2d 416, 424 (2d Cir. 1945), superseded by statute on other grounds; see also Antitrust Laws & Trade Regulation: Desk Ed. § 3.02 (2011).

Many courts have found monopoly power of less than 70 percent insufficient to support a claim of monopolization. See

26

_Fineman v. Armstrong World Indus., Inc._, 980 F.2d 171, 201 (3d Cir. 1992), _cert. denied_, 507 U.S. 921 (1993) (55 percent share insufficient); _R.J. Reynolds Tobacco Co. v. Philip Morris Inc._, 199 F. Supp. 2d 362 (M.D.N.C. 2002), _aff'd sub nom._ 67 F. App'x 810 (4th Cir. 2003) (51.3 percent share insufficient); _Holleb & Co. v. Produce Terminal Cold Storage Co._, 532 F.2d 29, 33 (7th Cir. 1976) ("Even if plaintiff had properly defined a relevant market, [it would not prevail because] it failed to prove that Produce Terminal had a dominant share exceeding 60 percent of the market."); _Hiland Dairy, Inc. v. Kroger Co._, 402 F.2d 968, 974, 974 n. 6 (8th Cir. 1968), _cert. denied_, 395 U.S. 961 (1969) (noting that "a substantial part of the market must be controlled by the monopolist to enable the raising and lowering of prices and the undue restriction on competition" and citing nine monopolization cases in which the market share ranged from 70 to 90 percent); _Colorado Interstate Gas Co. v. Natural Gas Pipeline Co._, 885 F.2d 683, 694 n. 18 (10th Cir. 1989) (_citing_ 2 E. Kintner, _Federal Antitrust Law_ § 12.6 (1980)) ("While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70 percent and 80 percent.").

Other decisions have given somewhat different signals. In _Broadway Delivery Corp. v. United Parcel Serv._, 651 F.2d 122,

27

130 (2d Cir. 1981), cert. denied, 454 U.S. 968 (1981), the
Second Circuit held that a jury instruction was erroneous
because the instruction suggested that, if a party had less than
50 percent market share, the party could not be guilty of
monopolization. In Cliff Food Stores, Inc. v. Kroger, Inc., 417
F.2d 203, 207 n. 2 (5th Cir. 1969), the Fifth Circuit held that
no monopoly power exists if market share is less than 50 percent
without discussing higher percentages. In Arthur S.
Langenderfer, Inc. v. S.E. Johnson Co., 917 F.2d 1413, 1443 (6th
Cir. 1990), cert. denied, 502 U.S. 808 (1991), the Sixth Circuit
found that an average market share of 58 percent over a 7 year-
period, where market share did not decrease, coupled with other
factors, was enough to defeat a motion for directed verdict, but
quoted "prominent authority" for the proposition that "there is
substantial merit in a presumption that market shares below 50
or 60 percent do not constitute monopoly power" (quoting Areeda
& Hovenkamp, Antitrust Law § 518.3 (1988 Supp.)). In Reazin v.
Blue Cross & Blue Shield of Kan., 899 F.2d 951, 968 (10th Cir.
1990), cert. denied, 497 U.S. 1005 (1990), the Third Circuit
held that a market share of 60 percent did not preclude a
finding of monopoly power, at least where the power possessed
was "durable."

In sum, market share is quite important in determining
whether monopoly power exists, but it is not the only

consideration.  Thus, courts finding monopoly power even in the
absence of a 70 percent or higher market share generally do so
after analyzing the "durability" of the defendant's power.
Areeda & Turner, Antitrust Law ¶ 505 (1989 supp.) (noting that
"durability" and not just "degree" determine the "significance
of market power"); E.I. du Pont de Nemours, 637 F.3d at 451
(noting that some courts have analyzed the "durability of the
defendant's market power" along with the degree of market share)
(citing Reazin v. Blue Cross & Blue Shield of Kan., 899 F.2d
951, 967-68 (10th Cir. 1990)).  The Reazin Court commented that
market share alone is not enough to show the presence or absence
of monopoly power in cases in which it does "not reflect actual
power to control price or exclude competition."  899 F.2d at 967
(citations omitted); see United States v. E.I. DuPont de Nemours
& Co., 351 U.S. 377, 391 (1956) ("Monopoly power is the power to
control prices or exclude competition.").  The durability
inquiry then is conducted to decipher whether a defendant had
the ability to manipulate pricing and define the field of
competition.

Durability is the ability to maintain power over pricing
and competition "for a significant period without erosion by new
entry or expansion."  2B Phillip E. Areeda, et al., Antitrust
Law P 501, at 111 (3d ed. 2007) (defining monopoly power to
include this durability element).  In determining whether market

power is "durable," courts have examined: (1) the existence of entry barriers;[10] (2) the difference in the defending party's market share and the next closest competitors' share; and (3) whether the defendant's market share declined or increased throughout the relevant time period.[11]   In Reazin, the Third Circuit considered several factors in determining that a jury could reasonably have found monopoly power, notwithstanding that the defendant's market was approximately 60 percent.   First, the court looked for the existence of "entry barriers." 899 F.2d at 968 ("Entry barriers are particular characteristics of a market

---

[10]   The Fourth Circuit noted other courts' analysis of entry barriers in its discussion of durability.   E.I. du Pont de Nemours, 637 F.3d at 451.

[11] See, e.g., Adv. Health-Care Servs. v. Giles Memorial Hosp., 846 F. Supp. 488, 494 (W.D. Va. 1994) ("If the defendants' market share is declining and/or other competitors' market shares are rising, then the defendants can hardly possess monopoly power."); Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir. 1982) (noting that a defendant's declining market share undermined any "inference of capacity to monopolize" that could be drawn from the size of the defendant's market share in considering an attempted monopolization claim); United States v. Syufy Enterprises, 903 F.2d 659, 666-70 (9th Cir. 1990) (emphasizing the importance of evaluating the ability of a defendant to "maintain" market share and, after noting the defendant's declining market share, affirming the district court's finding that no monopoly power existed); Greyhound Computer Corp. v. International Business Machines Corp., 559 F. 2d 488, 496 n. 18 (9th Cir. 1977) (noting that declining market share "may reflect an absence of market power"); Alpha Lyracom Space Communs. V. Comsat Corp., 968 F. Supp. 976, 895 (S.D.N.Y. 1996) (granting defendant's motion for summary judgment after noting that although entry barriers existed, the defendant's market share declined rather than increased during the relevant time period).

which impede entry by new firms into that market."). Second, the court noted that, although the market share was low enough to possibly support a presumption against monopoly, the defendant completely dominated the market, receiving some 62 percent of all earned health insurance premiums while its closest competitors retained less than 5 percent. Id. at 969 n. 26. Third, the court observed that, while it was possible that the defendant's share might have declined some during the relevant time period, that alone was not enough to make the jury's finding unreasonable. Id. at 970. Based on all these facts, the Third Circuit found that a jury reasonably could have found that the defendant had monopoly power.

The Fourth Circuit previously considered Kolon's SACC in this case and found that it alleged "sufficient facts to state a claim that [wa]s 'plausible on its face.'" E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). With respect to Kolon's monopolization claim, the Court of Appeals pointed to Kolon's allegation that DuPont's market share was "over 70 percent." Id. at 451. Thus, taking Kolon's allegation to be true, the Fourth Circuit concluded that it appeared possible that DuPont had "predominated" the relevant market. Hence, the Court of Appeals left it to discovery to

31

ascertain whether what Kolon had alleged about DuPont's market power (more than 70 percent) was factually correct.

Now, months after extensive discovery, it is clear, and both parties readily admit, that DuPont did not control more than 70 percent of the relevant market during the relevant time period. See Mem. Supp. Summ. J. at 29; Opp. Summ. J. at 28. In fact, Kolon's own expert takes the view that DuPont had a maximum market share of 59 percent during the relevant time period, and that DuPont's market share decreased to 55 percent during that three year period rather than increased. Mem. Supp. Summ. J. at Exhibit 21, Dr. Bamberger Rpt. at 16-17.

And, as the uncontested facts demonstrate, DuPont's decline in market share did not begin in 2006. The recent decrease in market share is simply part of a longer trend that began when Teijin first entered the para-aramid market in 1987. DuPont initially controlled the entire domestic para-aramid market, but its market share has steadily declined to present levels. In 2006, when Kolon says it first tried to enter the United States market, Teijin controlled 41 percent of the relevant market. By 2009, Teijin controlled 44 percent of that market. See Mem. Supp. Summ. J. at Exhibit 21, Dr. Bamberger Rpt. at 17.

Further, Dr. Bamberger's entire report is based on the assumption that European and United States' markets are properly comparable. See id. at 30 ("In particular, Kolon's experience

32

in Europe is a reasonable benchmark for Kolon's but-for world experience in the United States."). If the two markets were comparable and DuPont had control over pricing and competition, it would defy logic for DuPont to charge lower prices in the United States than in the European market. Yet, it is not disputed that DuPont's prices in the United States are lower than in Europe.

Kolon argues that there are significant entry barriers to the para-aramid market. Assuming that to be true for the purposes of summary judgment, that fact alone is not sufficient to show monopoly power. Here, DuPont indisputably controlled less than 70 percent of the market. And, it had not demonstrated the ability to maintain power "for a significant period without erosion." To the contrary. DuPont's market share steadily declined from 1990 to 2009. And, unlike the defendant in Reazin, DuPont had a major competitor who controlled almost as much of the market as it did during the relevant time period. DuPont also charged lower prices than "comparable" markets were charging. On this record, virtually undisputed as to the relevant product and geographic markets, the fact that there are significant entry barriers is

insufficient to fill the factual gaps in Kolon's monopolization claim.[12]

DuPont clearly lacks the power to control prices and exclude competition – otherwise, it would have been able to prevent the decrease in its market share and the rise of one of its major competitors. On this record, no reasonable jury could conclude that DuPont had monopoly power during the relevant time period. Summary judgment is granted with respect to Kolon's First Cause of Action on that ground alone.

## 2. Willful Maintenance -- Substantial Foreclosure

Even if Kolon had presented a triable issue on the monopoly power element, Kolon would also need to show that DuPont willfully maintained that power. On this element of its

---

[12] Kolon also argues that DuPont engaged in "price discrimination" (sometimes Kolon calls it "value pricing") and asserts that the fact that DuPont reduced production dramatically in 2009 should raise suspicion. There is no evidence presented here that DuPont's use of value pricing supports an inference that it possessed monopoly power. Quite the opposite. Kolon's expert admitted that Kolon also engages in the same practice; that it is, in fact, a common practice; that it is not generally an anticompetitive practice; and that it can promote efficiency. Reply Mem. Summ. J. at 6, Exhibit 3, Bamberger Tr. 293; id. at Exhibit 2, Bamberger Tr. 199-201.

With respect to DuPont's decrease in production in 2009, Kolon itself admitted that the United States was facing an economic crisis in 2009; that it is not anticompetitive to reduce production when demand decreases; and that Kolon itself had decreased sales during the same time period. Id. at Exhibit 2, Bamberger Tr. 45-46; see generally Reply Supp. Summ. J. at 7. And, as with value pricing, Kolon presented no evidence linking DuPont's decreased production to its claim that DuPont possessed monopoly power during the relevant time period.

monopolization claim, Kolon's theory is that DuPont maintained its monopoly power through the use of long-term multi-year, exclusive supply agreements.[13]   Kolon also has failed to make out a triable issue on this element.

It is, of course, necessary to remember that exclusive dealing arrangements, in and of themselves, are not illegal.   To violate antitrust laws, exclusive dealing arrangements must "foreclose competition in a substantial share of the line of commerce affected."   E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011) (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)).   The burden is on Kolon to demonstrate substantial foreclosure. United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C. Cir.

---

[13]   See SACC ¶¶ 28-37, 29 (alleging that, from 2006 to 2009, DuPont committed "various high-volume United States para-aramid fiber buyers to multi-year supply agreements that required the customer to purchase from 80% to 100% of the customer's requirements from DuPont," and that, "[b]ecause Dupont's supply contracts severely restricted access to customers and preclude effective competition, DuPont's conduct has had a direct, substantial and adverse effect on competition"); E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011) ("As to the second element of a monopolization claim, willful maintenance of monopoly power, Kolon's Counterclaim focuses on DuPont's use of essentially exclusive agreements with key para-aramid fiber purchasers."); Opp. Summ. J. at 2 (stating that DuPont attempted to maintain its monopoly power through "restrictive, long-term supply agreements").   As was the case with Kolon's market share allegations, its allegations about the supply agreements were not borne out in discovery.

2001) ("[I]n all cases, the plaintiff must both define the relevant market and prove the degree of foreclosure.").

Courts considering substantial foreclosure claims evaluate the proven percentage/degree of foreclosure, with the focus being on the competing manufacturers that have been closed-out of the relevant market due to the exclusive arrangements. Id.[14] ("Following Tampa Electric, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed."). Exclusive arrangements which "affect[] a small fraction of a market clearly cannot have the requisite harmful effect upon competition." Id.

Decisional law has not defined clearly a threshold at which foreclosure becomes substantial. Some courts have found foreclosure of 15 percent or less to be insubstantial. See Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1987) (noting the same and citing cases that have done so, American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1252 (3d Cir. 1975); Cornwell Quality Tools Co. v.

---

[14] See Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1295 (4th Cir. 1987) (noting that courts evaluating exclusive dealing arrangements also consider: (1) the type of goods and the geographic area; (2) how much of the market has been closed off to competing manufacturers because of the exclusive dealing arrangements of the defendant, and, in conjunction with this, whether competitors have found or are likely to find it difficult to enter or remain in the market; and (3) the procompetitive effects of the dealing arrangements that might justify their use).

CTS Co., 446 F.2d 825, 831 (9th Cir. 1971), cert. denied, 404 U.S. 1049 (1972)).   Other courts have noted or found that foreclosure of 40 to 50 percent was insubstantial.   See R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 388 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th Cir. 2003) (citing Sewell Plastics, Inc. v. Coca-Cola Co., 720 F. Supp. 1196, 1213, 1218-20 (W.D.N.C. 1989), aff'd in part, 912 F.2d 463 (4th Cir. 1990) (40 percent lawful where no anticompetitive harm shown)); Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236-37 (1st Cir. 1983) (50 percent lawful where little anticompetitive harm)); see also United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001) (indicating that foreclosure of 40 to 50 percent might be considered insubstantial absent "certain circumstances."). And, at least one court has found that foreclosure of 24 percent, in the context of 10 year requirements contracts, was substantial. See Reynolds, 199 F. Supp. 2d at 388 (citing Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 676 F.2d 1291, 1301, 1304 (9th Cir. 1982)).

In Tampa Electric and Chuck's Feed, the Supreme Court and the Fourth Circuit, respectively, discussed the substantial foreclosure analysis and the role of percentages in conducting that analysis. In Tampa Electric, the Court first determined the relevant market, and then determined the percent of that

37

market that the defendant's exclusive dealing arrangement, which was a 20-year, 100 percent requirements contract, foreclosed. 365 U.S. at 330-33. Finding that foreclosure was less than 1 percent, it determined that there could be no substantial foreclosure based on this percentage. Id. at 333. It then went on to analyze whether the contract at issue had substantially lessened competition in the relevant market. Id. It examined the contract dollar amount and the amount of product locked into the contract in the context of the annual profits and product traded in the relevant market. Id. at 334. Noting the many advantages of exclusive dealing arrangements, and that the contract constituted but a small portion of the relevant market, the Court held that the arrangement did not substantially decrease the volume of competition. Id. at 335.

In Chuck's Feed, a dog food company had an exclusive dealing arrangement with a pet food owner for an indeterminate period of time. Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1291 (4th Cir. 1987). The dog food company terminated the arrangement when the pet owner added a competing brand of dog food to his inventory. Id. After conducting the substantial foreclosure analysis, the Court of Appeals found that the district court had erred in failing to grant judgment notwithstanding the verdict. Id. at 1295. The Court explained that the plaintiff was required to "show a negative impact on

38

competition in the market as a whole." Id. Because the plaintiff had not met its burden to show "the extent to which [the dog food company] may have used exclusive dealing arrangements to 'foreclose the market,' or in other words, to keep competing brands of feed out of a substantial percentage of the [relevant market]," his claim failed as a matter of law. Id. (emphasis added).

The relevant market here is para-aramid fiber in the United States. Turning then to the matter of substantial foreclosure of that market and following the approach in Tampa Electric and Chuck's Feed, the Court must look first to what Kolon has shown with respect to the degree of foreclosure, or "how much of the market has been closed off" as a result of DuPont's supply agreements. Kolon simply has not made such a showing. In fact, Kolon has not even attempted to quantify foreclosure of the relevant market or to show how much of the market was closed off by DuPont's supply agreements.

Kolon's only analysis of percentage or degree is in its discussion of three particular segments of the para-aramid market. See Opp. Summ. J. at 9, 12. Possibly recognizing that it could not show substantial foreclosure in the relevant market it had defined in the SACC and has pressed throughout the case, Kolon switched gears in its opposition to summary judgment, arguing there that it was foreclosed from operating in three

39

particular segments of the para-aramid market.  Kolon's evidence of the degree of foreclosure in those segments, which is scant at best,[15] does nothing to reveal the amount of foreclosure in the market as a whole, a market which consists of numerous segments of varying size and a market that extends well beyond the few segments to which Kolon now points.[16]

Perhaps Kolon has abandoned any attempt to prove the extent of market foreclosure[17] because it realizes that the record shows that the degree of foreclosure here, if it exists at all, is de minimus.  DuPont had supply agreements with, at most, 21[18] out of

---

[15] Kolon does not quantify one of those three segments (tires) at all; it fails to address a significant portion of the pulp segment (omitting discussion of gaskets), and its analysis of fiber optic cable and the brakes sub-segment of pulp is incomplete and rife with false assumptions.  Opp. Summ. J. at 9, 12.

[16] See DuPont, 637 F.3d at 452 n. 12 (noting that, although Kolon had failed to calculate a specific percentage of market foreclosure in its SACC, it would not dismiss the counterclaim on that basis because the litigation was in the "pre-discovery" phase and Kolon had "insufficient information" to calculate the percentage at this stage).  Of course, discovery is now over and Kolon has not done what the law clearly requires it to do.

[17] In fact, in its opposition, Kolon impliedly agrees with DuPont's assertion that its supply agreements did not tie up a significant portion of the customer base.  Opp. Summ. J. at 33 ("[T]hat DuPont did not tie up the entire or even a significant portion of the customer base with onerous contracts is irrelevant.").

[18] An examination of the summary judgment papers, considering every agreement mentioned by both sides, reveals agreements with the following 21 customers to be potentially at issue: AFL, Akebono, OFS, Sumitono, Oceaneering, Corning, Nisshinbo,

approximately 1,000 potential commercial United States para-aramid customers during the relevant time period, resulting in, at best, 2 percent of that market being foreclosed. Mem. Supp. Summ. J. SOF ¶ 23 (uncontested fact); Mar. 16, 2012 Tr. 68.[19] But, examination of the agreements themselves reveals that this 2 percent figure greatly exaggerates the percent of foreclosure. Many, if not most, of the 21 agreements cannot even be classified as "exclusive" or "multi-year."

Some of the contracts were not volume requirements contracts at all, imposed no obligation on customers to purchase from DuPont, and can certainly not be considered "exclusive."[20] Even the volume requirements contracts themselves are not all "exclusive" because they ranged in their requirements, with some

---

Affinia, Garlock, Gates, Goodyear, Avon, Hollingsworth & Vose, Federal Mogul, MW Customer Papers, Toray, Fabric Development, Interface, Micro-Coax, Saint Gobain, and Tex Tech.
        Kolon mentioned in its opposition to summary judgment that it believed contracts existed that had not yet been produced. This contention is based on arguments in Kolon's Motion to Compel Production of Documents (Docket No. 133). That motion was pending when Kolon filed its opposition brief on December 23, 2011. (Docket No. 275). The Court granted the motion on February 22, 2012 (Docket No. 402). Kolon has not since altered its brief on this point. Nor did Kolon thereafter tell the Court that DuPont had not supplied all the relevant contracts.

[19] Even if the relevant market only included DuPont's 400 United States commercial para-aramid customers, the percent of foreclosure would be, at most, 5 percent.

[20] See, e.g., Mem. Supp. Summ. J. at Exhibits 63 (Interface), 65 (MW Custom Papers), 67 (Saint-Gobain).

requiring the purchase of a certain amount of pounds per month
or per year, and with others obligating customers to purchase
from 58 percent to 100 percent of their requirements from
DuPont.[21]  Further, the volume requirement contracts, with the
exception of Akebono,[22] were all of two years or less duration.
Several agreements were active for only one-year of the relevant
time period, and several others were active for only a few
months.[23]

---

[21] See, e.g., Mem. Supp. Summ. J. at Exhibits 69 (Affinia Group
100 percent requirements contract); 76 (MW Custom Papers 58
percent requirements contract); 81 (Federal Mogul 300,000
lbs/year contract).

[22] The parties agree that, of the 21, certain agreements did not
contain volume requirements. However, they disagree as to the
number.  DuPont claims that nine contracts did not contain
volume requirements.  Kolon contends that three of these
contracts, one with Akebono, one with Oceaneering, and one with
Fabric Development, were in fact volume requirements contracts.
See Opp. Summ. J. at 15 n. 25.  For the purposes of summary
judgment, the Court will assume that Kolon's representations are
correct.

[23] Goodyear, Corning, and Oceaneering are among those who entered
into contracts with obligations that lasted approximately one-
year during the relevant time period.  AFL, Tex Tech, and OFS
are among those who had contract-obligations that lasted only a
few months of the relevant time period.  Many of the contracts
allowed customers to terminate the contract without cause or
with a certain amount of notice.  See, e.g., Mem. Supp. Summ. J.
at Exhibits 69 (Affinia group; terminable without cause on 90
days-notice); 70 (AFL; terminable without cause on 180 days-
notice); 72 (Corning; terminable yearly); 76 (MW Custom Papers;
terminable without cause on 1 year-notice); 82 (Nisshinbo;
terminable without cause on 3 months-notice after first year of
contract); 83 (Nisshinbo (second contract); terminable without
cause on 180 days-notice).

The non-exclusivity and the relatively short length of time the contracts were in place allowed for DuPont's competitors to conduct business with these 21 customers, belying any claim of foreclosure.   Several of those 21 customers did business with Teijin, Kolon, or both, during the relevant time period.[24] Others sought to do business with Kolon but were turned away due to qualification or capacity issues.[25]   And, there is no dispute

---

[24] See, e.g., Mem. Supp. Summ. J. at Exhibit 16, Decl. Jerry Peters, Supply Chain Manager at Gates (explaining that Gates had purchased from Teijin, Kolon, and DuPont during the relevant time period, and that decisions were based on pricing); Mem. Supp. Summ. J. at Exhibit 10, Decl. Paul Williams, Prior Purchasing Manager OFS (explaining that OFS has started to purchase yarn from Kolon despite DuPont's recent supply agreement with OFS and that OFS did not do so previously because Kolon did not have adequate supply); see also Mem. Supp. Summ. J. SOF ¶ 47 (uncontested fact) (explaining that Kolon sold Heracron to Corning, Garlock, Federal Mogul, and MW Custom Papers during the relevant time period).

[25] See, e.g. Mem. Supp. Summ. J. at Exhibit 30, Dep. of David Murphy, Kolon United States sales representative, at 28-29, 31:17-32:20, 151-152 (explaining that he did not approve sales to Goodyear during the relevant time period, and that Kolon did not qualify its product with Goodyear until 2011); Mem. Supp. Summ. J. at Exhibit 12, Decl. of Mr. Jain, Chief Engineer Team Leader at Goodyear, ¶ 21 ("Prior to February 2011, Goodyear could not have and would not have purchased Heracron because it had not met Goodyear's standards and specifications."); Opp. Summ. J. at Exhibit 44-A, Aug. 2008 email from Mr. Kang in response to Akebono's request for quotations for Heracron ("Several month back, we negotiated with Akebono brake (Japan) for long term biz plan and Quality . . . [s]o, we don't have enough room for supplying to Akebono Brake Corporation in North America this year."); Mem. Supp. Summ. J. at Exhibit 96, email from United States Kolon sales representative Michael Mitchell to OFS ("Thank you for the opportunity to bid on the OFS business . . . unfortunately, all our production capacity for high modulus yarn has already been allocated to existing

that these 21 customers were not the only customers in the various para-aramid segments in which they operated (tires, MRG, pulp, fiber optic cable).   Nor is there any dispute that the supply agreements, as a group, left entire areas and segments of the para-aramid market in the United States completely untouched.

The supply agreements made up only a small fraction of DuPont's revenue from sales of Kevlar in the United States. And, because DuPont's share of the market was 59 percent or less during the relevant time period, those agreements accounted for an even smaller fraction of the total revenue from para-aramid sales in the United States.   Pl. Mem. Supp. Motion to Compel at 5 (Docket No. 164); Mem. Supp. Summ. J. at 11.

On this record, the percentage of foreclosure here, cannot as a matter of law, constitute sufficient grounds for a finding of substantial foreclosure.   And, no reasonable jury could find otherwise.

The inquiry next turns to the record respecting the effect of the supply agreements, such as they were, on overall competition, focusing on whether other competitors have been able to remain in or to enter the market.   See Chuck's Feed &

customers."); see also Seo Dep. Mem. Supp. Summ. J. at Exhibit 56, 140-41 ("The overall amount to be used by OFS is 255 tons . . . [f]or us, to provide a price for 80 percent of that, that is too much of a quantity.").

Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1295 (4th Cir. 1987). Kolon has put forth no evidence demonstrating that other competitors have been shut-out of the market. All the evidence in the record is to the contrary. Teijin's market share grew during the relevant time period as DuPont's declined. Hyosung, a Korean company, began marketing para-aramid in the United States in early 2008. Mem. Supp. Summ. J. SOF ¶ 5 n. 7 (uncontested fact). In a market as specialized as the para-aramid market, where DuPont was the only seller in the United States throughout the 1970s and well into the 1980s, the entry of two new competitors (Kolon and Hyosung) along with the continued, relentless ascendance of a third competitor (Teijin) is marked evidence that renders hollow Kolon's contention that the supply agreements adversely affected overall competition in the relevant period.

Along with foreclosure percentage and competitor viability, in determining the degree of foreclosure caused by an exclusive dealing arrangement, courts also consider "the duration of the agreement, the ability of consumers to comparison shop and their propensity to switch products, the existence of barriers to entry, and the availability of alternative channels of distribution." R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 389 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th Cir. 2003) (citing Ryko Mfg. Co. v. Eden Servs.,

823 F.2d 1215, 1232 (8th Cir. 1987)); XI Herbert Hovenkamp
Antitrust Law 1821d (1998)).   "The lower the foreclosure
percentage, the more salient these factors become in determining
whether there has been substantial foreclosure."   Id.

Here, these factors show a lack of substantial foreclosure.
First, as explained above, the duration of nearly all of the
agreements on which Kolon rests its case was approximately two
years or less.   Second, the evidence does not show that
consumers have difficulty comparison shopping.   The record shows
that, amongst others, Corning, Garlock, Federal Mogul, OFS,
Gates, Akebono, MW Customer Papers, and Goodyear all did
business with Kolon during the relevant time period.   See Mem.
Supp. Summ. J. SOF ¶ 47 (uncontested fact); supra n. 24 & n. 25.
And, Kolon has not demonstrated that consumers have a low
propensity to switch sellers.   In fact, the record shows that
OFS and Goodyear actually did switch some of their business to
Kolon after Kolon increased its supply capacity and was
qualified.   Id.   Further, Gates switched between Teijin, Kolon,
and DuPont during the relevant time period.   The record on this
aspect of the analysis also disproves substantial foreclosure.

There is no question that the para-aramid market, by its
very nature, presents entry barriers, and taking the evidence in
the light most favorable to Kolon for the purposes of summary
judgment, these barriers are even higher in the United States

46

where the Berry Amendment prevents international firms from providing para-aramid fiber to the United States Department of Defense. SACC ¶ 27 (Docket No. 2). However, the existence of entry barriers alone does not demonstrate substantial foreclosure.[26]

Not surprisingly, Kolon does not now contend that it has shown any particular degree of foreclosure or that DuPont's supply agreements have locked up a significant portion of the market. Instead, Kolon argues that it has met its burden by demonstrating that the exclusive dealing arrangements at issue formed a "critical bridge" to "high volume" customers, thereby substantially foreclosing competition. Kolon cites to LePage's, Inc. v. Minnesota Mining & Mfg., 324 F.3d 141, 147 (3d Cir. 2003) and United States v. Dentsply Int'l, Inc., 399 F.3d 181, 189 (3d Cir. 2005) in support of this argument.

In LePage's, the defendant had a 90 percent market share and conceded that it had monopoly power. 324 F.3d at 144. The Third Circuit was left to determine whether the defendant's

---

[26] If this were true, then both Kolon and Teijin would have "substantially foreclosed" the market during the relevant time period, because both entered into long-term exclusive supply contracts in the para-aramid market during that time frame. See Mem. Supp. Summ. J. SOF ¶¶ 22, 47 (uncontested fact).

Supply agreements, even in markets with high-entry barriers, have certain advantages for both customers and producers. In fact, customers often request these agreements to ensure stable pricing and supply. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 334 (1961).

exclusive dealing arrangements, when coupled with bundled rebate packages it had offered to induce the plaintiff's major customers into reducing or eliminating their business with the plaintiff, substantially foreclosed the relevant market.

The Court found that, in light of the facts that the defendant had monopoly power and that the plaintiff had shown that it had been foreclosed from doing business with most of its major customers by the defendant's purposeful use of the new bundled rebate programs, a jury could reasonably find that there was substantial foreclosure. Id. at 152-62. It noted that "a monopolist is not free to take certain actions that a company in a competitive [] market may take, because there is no market constraint on a monopolist's behavior," id. at 150, and that "exclusionary conduct by a monopolist [is] more likely to be anticompetitive than ordinary § 1 exclusionary conduct." Id. at 159 (citing United States v. Microsoft Corp., 253 F.3d 34, 70-71 (D.C. Cir. 2001) in which the monopolist had a 95 percent market share)).

In United States v. Dentsply, the defendant-manufacturer had a 75-80 percent market share, while the next largest competitor had a 5 percent market share. 399 F.3d at 188. The defendant-manufacturer made strategic exclusive dealing arrangements with product distributors, such that the only way for competitors to enter the market was by selling directly to

48

product users.  Id.  The district court determined that, because other manufacturers could still sell directly, the market was not foreclosed.  Id.  The Court of Appeals held that the district court had erred in discerning the relevant market by failing to recognize that the mode of business in the market was to work through distributors, and that direct selling was not practical.  Id. at 189-90 ("[T]he Court's scrutiny should have been applied not to the 'ultimate consumers' who used the [product], but to the 'customers' who purchased the [product].").

In LePage's, the plaintiff's description of the "exclusionary conduct" at issue specifically covered: (1) exclusionary dealing contracts; and (2) bundled rebate programs with major distributors.  Unlike in this case, the plaintiff demonstrated that the defendant's "bundle rebate" program effectively cut off its business with the major retailers in the relevant market, and that this rebate program was introduced in response to the plaintiff's entry into the market with the purpose of reducing/eliminating plaintiff's sales to the retailers.  The plaintiff also showed that the defendant's efforts had been successful, that the defendant had reached out to many of its former customers and that, as a result, those customers had reduced business with the plaintiff.  In this case, on the other hand, it is undisputed that DuPont had supply

49

contracts before 2006, and Kolon has not shown that customers it reached out to refused to do business with it because of the supply contracts.[27]  And, in _Dentsply_, unlike in this case, the issue was the definition of the relevant market.  This, of course, is at the heart of cases finding substantial foreclosure based on the "critical bridge" line of reasoning.  In markets where, to be truly competitive, one must sell to a specific group of individuals "distributors," who then sell to "consumers," or in which there is necessarily a "middle-man,"

---

[27]  Kolon cites to two portions of its sales representatives' testimony to support its argument that DuPont's supply agreements interfered with its business: (1) Mr. Mitchell testified that he believed that Corning did business only with DuPont and Teijin because of supply agreements Corning had with them; and (2) Mr. Murphy testified that he was unable to sell Heracron to Goodyear because of Goodyear's supply agreement with DuPont.  Opp. Summ. J. at 17.

However, the records shows both Mr. Mitchell and Mr. Murphy testified that factors other than the supply agreements were responsible for their lack of business.  Mem. Supp. Summ. J. at Exhibit 7, Mitchell Tr. 84 (explaining that he was not "aware" that DuPont's or Teijin's contracts limited Kolon's ability to sell in the United States); id. at Exhibit 30, Murphy Tr. 28. (explaining that Kolon could not sell to Goodyear during the relevant time period because of qualification and approval issues).

During the relevant time period, Kolon acknowledged that, out of approximately 1,000 potential United States commercial para-aramid customers in the United States, it attempted to qualify Heracron with only nine customers and contacted approximately 68.  See Mem. Supp. Summ. J. SOF ¶ 46 (uncontested fact) (citing Exhibit 97, Kolon's Resp. to 2nd Set of Interrogs., 10/4/09, at 5-10).  Thus, it attempted to qualify Heracron with less than 1 percent of United States customers and actually contacted less than 7 percent.  The record shows that this frail effort, and not DuPont's supply agreements, explains Kolon's low market share in the United States.

defining the relevant market to include both the distributors and the consumers is misleading. If a monopolist ties up the distributors, there is no practical way to reach the consumers and effectively compete.

That simply is not what the record shows here. Kolon has not argued that the customers with whom DuPont has supply agreements are "distributors" or "middle-men." The record presents no reason to think that Kolon could not sell to other customers occupying the same segment of the para-aramid market (pulp, tires, MRG, fiber optic cables) as customers that have supply agreements with DuPont. Further, Kolon offered no explanation as to why DuPont's supply agreements prevent it and other competitors from seeking business in other unimpeded segments of the para-aramid market. Nor has Kolon shown why the particular segments on which it focuses are, in fact, "key" or "critical" in the para-aramid market.

In sum, neither LePage's nor Dentsply is applicable here. In both cases, monopoly power was clearly established. The courts necessarily viewed the substantial foreclosure inquiry through that lens. E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011) ("Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist."). Moreover, the facts in LePage's and Dentsply simply are not

present in this case.   On the whole, the facts of those cases
and the presence there of clearly established monopoly power
make it impossible to conclude, as Kolon would have it, that
those cases govern this quite different case.

Having failed to establish that DuPont had monopoly power,
and having failed to prove substantial foreclosure, Kolon cannot
defeat DuPont's motion for summary judgment on the First Cause
of Action.[28]

## II.  THE ATTEMPTED MONOPOLIZATION CLAIM:   SECOND CAUSE OF ACTION

A party is guilty of "attempted monopolization" if it
employs "methods, means, and practices which would, if
successful[] accomplish monopolization, and which, though
falling short, nevertheless approach so close as to create a
dangerous probability of it."   See, e.g., American Tobacco Co.
v. United States, 328 U.S. 781, 785 (1946).   To prevail on a
claim of attempted monopolization then, a plaintiff must
demonstrate:

    (1) a specific intent to monopolize a relevant market;
    (2) predatory or anticompetitive acts;
    (3) a dangerous probability of successful monopolization.

R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d
362, 394 (M.D.N.C. 2002), aff'd sub nom. 67 F. App'x 810 (4th

---

[28] It is not necessary to address whether DuPont's activity was
"procompetitive" since it is clear that DuPont did not have
monopoly power and since Kolon has not proven foreclosure.

Cir. 2003) (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).

Kolon alleges that DuPont's past conduct and direct statements demonstrate that it had specific intent to monopolize the para-aramid market. Kolon further alleges that DuPont has engaged in anticompetitive activity through its supply agreements with high-volume para-aramid customers. See SACC ¶ 44 ("DuPont's long-term supply contracts severely restrict access to key United States para-aramid purchasers necessary to gaining threshold sales required to effectively compete in the United States."); see also E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 452, 453 (4th Cir. 2011) ("Here, Kolon alleged that DuPont's use of multi-year exclusive contracts with high-volume para-aramid fiber purchasers constituted improper anticompetitive conduct."). And, Kolon claims that DuPont's market share, prices in the United States, and supply shortage in the United States for para-aramid "indicate a dangerous probability of success." SACC ¶ 44.

## 1.  **Anticompetitive Conduct**[29]

We turn first to Kolon's contention that DuPont engaged in anticompetitive acts through its use of exclusive agreements with high-volume para-aramid customers. As explained in Part I.2 above, exclusive agreements are not per se illegal. See Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1987).  To violate antitrust laws, an exclusive dealing arrangement must "foreclose competition in a substantial share of the line of commerce affected." E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011) (quoting Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961)); Chuck's Feed, 810 F.2d at 1293 (quoting the same and also citing Standard Oil Company of California v. United States, 337 U.S. 293, 314 (1949) and Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356-57 (1922) for the proposition)).

---

[29] It will be assumed for purposes of the motion for summary judgment that there is a triable issue of fact as to whether DuPont had specific intent to monopolize the para-aramid market in the United States.  Kolon's argument on this point is that DuPont discovered the segments of the market that Kolon planned to enter and then implemented supply contracts in order to prevent Kolon's entry. See Mem. Opp. Summ. J. at 6-9.

Of course, the desire to prevent a competitor from taking one's customers or to prevent the loss of market share is not, in and of itself, illegal.  The purpose of the antitrust laws is to promote and protect competition, not to thwart it. See Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 931 (4th Cir. 1990)(citing Brown Shoe Co. v. United States, 370 U.S. 294 (1962)).  No competitor can be expected to welcome news of a new entrant in the market.

For the reasons set forth above in Part I.2, Kolon has failed to show that there is a genuine issue of material fact that DuPont has substantially foreclosed the relevant market with the so-called long-term supply agreements. The supply agreements at issue constituted a small percentage of DuPont's total sales. DuPont's market share decreased from 59 to 55 percent during the relevant time period. Out of a pool of some 1,000 customers, DuPont had supply agreements with only 21, exclusive volume agreements with only 14, and exclusive volume agreements that were active for a period longer than one-year during the relevant time period with only 11 customers.[30] There were entire segments of the para-aramid market in which DuPont had no supply agreements.[31] And, important customers with which DuPont had supply agreements actually conducted and sought business with Kolon and with Teijin during the relevant period. And, during the relevant period, Kolon and Teijin both had their

---

[30] Some of these 11 customers could terminate the contract without cause after a certain period of time, most often one-year, so those contracts would likely be considered one-year contracts instead of multi-year contracts. And, some could be considered non-exclusive in the sense that they had low volume requirements, only required the buyer not to exceed a maximum amount of purchases per year, or only limited purchases of a particular type. However, granting every inference in Kolon's favor for the purposes of summary judgment, the Court assumes they could be classified as multi-year contracts.

[31] Kolon has offered no evidence as to why it did not do business in these other segments or as to what percent of the market each segment (tires, MRG, aerospace, pulp, etc.) covered.

own supply agreements with para-aramid customers in the United States; Hyosung, a Korean competitor, entered the United States market; and Teijin's market share continued to grow.

On this record, no reasonable jury could find that the so-called long-term contracts constituted substantial foreclosure of the para-aramid market in the relevant period. Therefore, there is no genuine issue of material fact on the anticompetitive element of the attempted monopolization claim, and DuPont's motion for summary judgment as to that claim must be granted for that reason alone.

## 2. Dangerous Probability of Success

Even if Kolon had made out a triable issue on the anticompetitive element of its Second Cause of Action, it would have to prove the third element of an attempted monopolization claim: that there was a dangerous probability of successful monopolization. An analysis of this element looks at the defendant's ability to control the relevant market. E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc., 637 F.3d 435, 453 (4th Cir. 2011). The analysis examines market share, the ability to control prices and the ability to exclude competitors. The plaintiff must prove that the alleged anticompetitive acts and the specific intent to monopolize "result in a reasonable probability that monopolization will sooner or later occur." O'Malley, Grenig, Lee, Federal Jury

Practice and Instruction, § 150.32 (5th ed. 2001); Sand,
Siffert, Reiss, Batterman, Modern Federal Jury Instructions
(Civil), Instruction 80-29; Spectrum Sports v. McQuillan, 506
U.S. 447, 456 (1993) (citing Copperweld Corp. v. Independence
Tube Corp., 467 U.S. 752, 767-68 (1984) ([conduct] "is unlawful
only when it threatens actual monopolization . . . judging
unilateral conduct in this manner reduces the risk that the
antitrust laws will dampen the competitive zeal of a single
aggressive entrepreneur.")).

     This record shows that, in the relevant years, DuPont's
market power declined from 59 percent to 55 percent, a
continuation of a 17 year decline in market power. At the same
time, the market power of Teijin was increasing, and
significantly so. Teijin went from 41 percent market share in
2006 to 44 percent in 2009. Two new companies, Hyosung and
Kolon, entered the market.

     The record does not establish that DuPont had the ability
to control prices. Indeed, the record shows that DuPont had to
charge lower prices in the United States market than in the
European market, a market Kolon claims to have been comparable
to the United States market and a market in which Kolon says it
was able to compete.

     And, while it appears that Kolon had difficulty entering
the United States market, the record shows that was through no

fault of DuPont.  Instead, the record shows that, during and after the relevant time period (2005-2011), Goodyear, one of DuPont's biggest customers, wanted to buy from Kolon and was helping Kolon in an effort to qualify Heracron to meet Goodyear specifications.  Mem. Supp. Summ. J. at Exhibit 30, Dep. of David Murphy, Kolon United States sales representative, at 28-29, 31:17-32:20, 151-152.  Kolon, however, could not achieve qualification during the relevant period.  Id.  In addition, OFS solicited bids from Kolon in 2008, but Kolon chose not to bid because of its own capacity limitations.  Mem. Supp. Summ. J. at Exhibit 96, email from Kolon's sales representative in the United States, Michael Mitchell, to OFS.[32]  And, other customers that had supply contracts with DuPont actually did business with Kolon during the relevant time period.[33]  On this record, it cannot be said that Kolon has shown a triable issue respecting DuPont's ability to exclude competitors from the market.

Indeed, Kolon has not demonstrated the existence of evidence that would permit a reasonable jury to find that the alleged anticompetitive acts (which have not been shown) and the alleged intent to monopolize (as to which a triable issue is

---

[32] Once Kolon had capacity, Kolon did do business with OFS.

[33] Corning, Garlock, Federal Mogul, Gates, Akebono, MW Customer Papers, and Goodyear all did business with Kolon during the relevant time period.  See Mem. Supp. Summ. J. SOF ¶ 47 (uncontested fact); supra n. 24 & n. 25.

assumed) presented a reasonable probability that monopolization would sooner or later occur.

Hence, there is no triable issue of fact on the "anticompetitive acts" or the "dangerous probability" elements of Kolon's Second Cause of Action:   Attempted Monopolization. Therefore, that claim cannot withstand summary judgment.

### CONCLUSION

For the foregoing reasons, Dupont's MOTION FOR SUMMARY JUDGMENT (Docket No. 254) will be granted.

It is so ORDERED.

_____  /s/      _REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  April 5, 2012